# In the United States Court of Federal Claims

**No. 20-1230C**
**Filed: February 7, 2021**
**Redacted Version Issued for Publication: March 18, 2021[1]**

| | |
|---|---|
| * * * * * * * * * * * * * * * * ** | * |
| | * |
| **MORTGAGE CONTRACTING** | * |
| **SERVICES, LLC,** | * |
| | * |
| **Protestor** | * |
| | * |
| **v.** | * |
| | * |
| **THE UNITED STATES,** | * |
| | * |
| **Defendant,** | * |
| | * |
| **v.** | * |
| | * |
| **INFORMATION SYSTEMS &** | * |
| **NETWORKS CORPORATION,** | * |
| | * |
| **Defendant-intervenor.** | * |
| * * * * * * * * * * * * * * * ** | * |

**Greg S. Jacobs**, Polsinelli, PC, Washington, DC for protestor. With him was **Erin Felix**, Polsinelli, PC.

**Ashley Akers**, Department of Justice, Washington, DC**,** Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. With her were **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Brian Boynton**, Acting Assistant Attorney General, Civil Division.

**Matthew T. Schoonover**, Schoonover & Moriarty LLC, Olathe, KS for intervenor.

---

[1] This Opinion was issued under seal on February 7, 2021. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the redactions that the parties proposed in response to the court's request and other conforming redactions. Words which are redacted are reflected with the notation: "[redacted]."

**O P I N I O N**

**HORN, J.**


    In the above-captioned post-award bid protest, protestor Mortgage Contracting Services, LLC (MCS) challenges the decision of the United States Department of Agriculture (USDA) to award a contract to intervenor, Information System and Networks Corporation (ISN), arguing that the award was "arbitrary and capricious" and should be reversed. This Opinion memorializes the oral decision issued by the court which granted protestor's motion for injunctive relief, effective immediately at the time of the oral decision.

**FINDINGS OF FACT**

    The solicitation at issue in the above captioned protest, Solicitation No. 12SAD119R0003 (the Solicitation), explained that the National Account and Financial Operations Center (NFAOC) is a unit within the USDA's Rural Division (RD) and is

> charged with servicing mortgage loans and grants extended to individuals in rural areas throughout the United States, Puerto Rico, American Samoa, the U.S. Virgin Islands, and the Pacific Trust Territories. Beginning operation in October 1996, NFAOC has serviced as many as 650,000 government loans and grants originating with U.S. Treasury funds. NFAOC's mission is to be a cost effective service provider that strives to keep individuals and families in their homes through the use of various servicing tools including payment subsidies, moratoriums on payments, partial payment agreements and other methods. Low and very low income families are provided this subsidized loan program through a network of field offices across the United States of America (USA), its territories, and commonwealths.

(capitalization in original). The Solicitation continued:

> The USDA, RD, NFAOC provides exceptional servicing to 258,020 Single Family Homes (SFH) Direct Loans (DL) made or insured by the Rural Housing Service (RHS). Currently the loans are valued at over $14 billion in unpaid principal balance. Under the DL program, individuals and families receive direct financial assistance from the RD Housing Programs in the form of home loans to eligible low, and very low-income households, at affordable interest rates to achieve homeownership. The agency is committed to providing an opportunity for rural Americans to become and remain successful homeowners.

(capitalization in original).

On April 27, 2019, the USDA issued the Solicitation for property preservation and inspection services for its rural property portfolio. The Solicitation contemplated a single award, indefinite-delivery, indefinite quantity contract to the offeror evaluated as the best-value offeror. The indefinite-delivery, indefinite quantity contract was to be for a total of 18-months, and contemplated the work to be issued under two task orders: Task Order 1 was to be issued for the first 12 months, and was to be issued at the time of award of the total contract, and Task Order 2 was to be issued for the remaining six months.

Under the heading: "**Relative Importance of Factors**" the Solicitation stated:

The award resulting from this solicitation will be made based on the best overall proposal that is determined to be the most beneficial to the Government (i.e., best value tradeoff process). The Technical Capability Factor is slightly more important than the Past Performance Factor. Technical Capability Subfactors, 1.1, 1.2, 1.3, 1.4 and 1.5, are rated in descending order of importance. Overall, Non-Price Factors, when combined, are significantly more important than Price. Price is not an adjectically rated Factor; however, the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal. For each proposal received, the Government will evaluate the following factors:

**Factor 1:**    Technical Capability (overall capabilities to encompass subfactors belows [sic]:

Subfactor 1.1        Relevant Experience
Subfactor 1.2        Nationwide Coverage, Geographic Service Area
Subfactor 1.3        Management Approach, to include QASP [Quality Assurance Surveillance Plan]
Subfactor 1.4        Staffing    Plan,    Key    Personnel    Resumes, Subcontractors; Subcontracting Plan
Subfactor 1.5        Property Management System

**Factor 2:**    Past Performance

**Factor 3:**    Price

Contents of the written proposals will be evaluated to determine the degree and extent to which the requirements set forth in the RFP are satisfied. If a proposal is determined to be incomplete or fails to fully meet any material requirement of the RFP, that may render a proposal unacceptable and, thus, ineligible for award.

In accordance with 52.215-1(f)(4), it is the Government's intent to award without discussion; therefore, it is incumbent upon all offers to submit their best proposal. Award may not necessarily be made to the lowest price(s)

offered. As such, offerors are encouraged to submit their best proposal upon initial submission.

(capitalization and emphasis in original).

The work to be performed under the contract was broken down into six separate contract line items (CLINs): (1) "CLIN 0001: Property Inspections (REO [Real Estate Owned] and Foreclosure Custodial Properties);" (2) "CLIN 0002: Property Preservation (REO and Foreclosure Custodial Properties);" (3) "CLIN 003: Reports, NSP [Not Separately Priced];" (4) "CLIN 004: Contingency Preservation, Pass Through Expenses (Cost Reimbursable IAW Price List);" (5) "CLIN 005: Other Direct Costs – Travel, NTE [Not to Exceed];" and (6) "CLIN 006: TRANSITION-IN/OUT." (all capitalization original). As reflected below, only CLIN 0001 (CLIN 1) and CLIN 0002 (CLIN 2) were priced.[2]

For the Technical Factor, the Solicitation stated:

**FACTOR 1 – Technical Capability** – Overall the Technical Capability will be evaluated based on the extent to which it is demonstrated a likelihood of successful performance of the requirements of the Performance Work Statement (PWS) (Attachment A). The effectiveness and feasibility of the proposed Technical Capability and the offerors understanding of the work will be considered as part of the assessing the likelihood of successful performance.

(capitalization and emphasis in original). The Solicitation explained:

There are five technical capability subfactors that will be evaluated and considered in descending order of importance as follows and evaluated based on:

**Sub-factor 1.1** - **Relevant Experience -** Demonstration of experience in providing services to assist USDA, RD in providing a variety of property/asset management services associated with pre and post liquidation of SFH rural properties serving as security for rural housing loans and guarantees of equivalent portfolio size, as specifically listed in the PWS.

**Sub-factor 1.2 – Nationwide Coverage – Geographical Service Area** Demonstration of the capacity to provide a nationwide "Heatmap" of available personnel for property preservation services (vendors/subcontractors); displaying the ability, currently or in the future, to provide services to all 50 United States and the territories of Puerto Rico, the Virgin the Western Pacific U.S. Territories. To confirm this ability required, the Offeror must submit a service Heatmap, as discuss in the PWS [Performance Work Statement] (also see Heatmap Information, Attachment C1) that reflects coverage of all the states, counties, and territories, and

---

[2] The court notes the numbering of the CLINs was inconsistent. For example, CLIN 1 was sometimes labeled as CLIN 0001 and other times labeled as CLIN 001 or CLIN 1.

must also include a plan with tentative timelines to provide 100% coverage for all USDA services areas.

**Sub-factor 1.3 – Management Approach** - Demonstration that the offeror can provide all management, supervision, labor, tools, supplies, insurance, taxes, fees, permits to complete the services, including all reporting and documentation as explicitly set forth in the PWS. A demonstration of how offeror will manage RD's large nationwide portfolio and an and all quality assurance implementation. A QASP must be submitted with this plan (see QASP Template Attachment C2).

**Sub-factor 1. 4 – Staffing Plan -** Demonstration that current staff available along with planned staffing levels to meet the technical requirements and schedules identified in the PWS. Demonstration of ability to onboard and ramp-up staffing in a given service area. Demonstration of staffing (or a network of subcontractors (available to handle hazardous materials remediation (Meth/LB Paint/Mold). To minimally satisfy this sub-factor the submission must identify staff to be used to satisfy the scope of this requirement to include both prime and subcontracting staffs. Staffing levels that are deemed as unrealistic to satisfy the requirement scope will receive an "Unacceptable" rating. The Offeror is required to include resumes for key personnel positions and emergency points of contacts. Offeror's subcontracting plan must be discussed in this section, and the subcontracting plan (see C5, Subcontracting Plan Template included with information submitted with Volume 4, Other Documents).

**Sub-factor 1.5 Property Management System** – Demonstration that Offeror has a system that is able to identify real time status (ordering and tracking) of each RD property, and demonstrate the capability to timely exchange data with other clients' loan servicing systems (i.e, USDA utilizes LoanServ); and must demonstrate that USDA personnel will have access to request work orders review documentation, and approve/reject items, etc.

(capitalization and emphasis in original). The Solicitation provided that the technical aspect of each proposal would be evaluated using a "Combined Technical/Risk Rating," which included "consideration of risk in conjunction with the strengths, weaknesses, uncertainties, and deficiencies in determining technical ratings." The Solicitation provided the following table on which the offerors' technical capabilities would be evaluated:

| Color Rating | Adjectival Rating | Description |
|---|---|---|
| Blue | Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Purple | Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Yellow | Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Red | Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is not awardable. |

The Solicitation defined the terms strength, weakness, deficiency, and risk as:

**Strength** - any aspect of a proposal when judged against a stated evaluation criterion enhances the merit of the proposal or increases the probability of successful performance of the contract. A significant strength appreciably enhances the merit of a proposal or appreciably increases the probability of successful contract performance.

**Weakness** - A flaw in the proposal that increases the risk of unsuccessful contract performance. A significant weakness in a proposal is a flaw that appreciably increases the risk of unsuccessful contract performance.

**Deficiency** - material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

**Risk** – Assessment of risk considers potential for disruption of schedule, increased costs, degradation of performance, the need for increased Government oversight, or the likelihood of unsuccessful contract performance. Factor ratings can be adjusted based on a risk consideration.

(capitalization and emphasis in original). For the Past Performance Factor, the Solicitation stated:

**FACTOR 2 – Past Performance**
The past performance confidence assessment rating is based on the offeror's overall record of recency, relevancy, and quality of performance. In addition, for large business concerns, the Government will evaluate past

6

performance to determine the extent to which offeror has attained applicable goals for small business participation under prior contracts that required subcontracting plans. Relevant experience must be demonstrated within the last three years of providing property preservation and inspection services as required in the PWS. Specifically, a review of record of quality of service, personnel, adhering to contract schedule and cost contract, and attainment of subcontracting goals, if applicable. In accordance with FAR 15.305(a)(2), the currency and relevance of the information, source of the information, context of the data, and general trends in contractor's performance shall be considered. These are combined to establish one performance confidence assessment rating for each offeror. In addition, this assessment of offeror's performance will contribute to the responsibility determination.

(capitalization and emphasis in original). Regarding the Past Performance Factor, each proposal was to be evaluated under the following method:

| Adjectival Rating | Description |
|---|---|
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |

| Neutral Confidence | No recent/relevant performance record is available, or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
|---|---|
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

Regarding the Price Factor, the Solicitation stated:

The base IDIQ 18-month effort as well as Task Order 1, CLINs 001 and 002, will be evaluated for price reasonableness, realism and balance, as

further described below. The total pricing, including the NTE [Not to Exceed] plug-in CLINs 004, 005, and 006 will be totaled to come up with the total IDIQ ceiling price.

CLINS 003 Reports is Not Separately Priced (NSP) and thus not be [sic] evaluated.

CLINs 004, 005 and 006 also will not be evaluated. The amounts for these CLINs are estimated plug-in amounts, as shown in C4 Pricing Worksheets. As noted above, the plug-in amounts will be included in the ceiling total from CLIN 001 and 002 for the total IDIQ ceiling price; and for Task Order 1, the total task order price. . . .

### 7.1 Proposal Analysis

The Contracting Officer is responsible for evaluating price/cost proposals using the methods of price and cost analysis in accordance with the Federal Acquisition Regulations. The CO will use the processes of price and realism analysis, and review service prices for balance in pricing as discussed below.

### 7.2 Price Analysis

Price analysis is a process of examining and analyzing a proposed price without evaluating separate cost elements and proposed profit/fee to ensure that the proposed price is fair and reasonable. The CO may use the following techniques in performing price analysis:

(a) Comparison of proposed prices received in response to the Solicitation;
(b) Comparison of previously proposed prices and contract prices with current proposed prices for the same or similar services (labor categories) in comparable quantities; and,
(c) Comparison of proposed prices with independent cost estimates.

### 7.3 Realism Analysis

The purpose of realism analysis is to ensure that proposed prices are not so low such that contract performance is put at risk from either a technical and/or cost perspective. It is separate from analyses performed to determine price reasonableness. Realism analysis determines whether an offeror's proposed costs and/or prices:

(a) Are realistic for the work to be performed;
(b) Reflect a clear understanding of the requirements; and
(c) Are consistent with the various elements of the offeror's technical proposal.

> Price Realism analysis is an objective process that focuses on the proposed price and performance risks. Price realism is used when requirements may not be fully understood by the offeror, there are quality concerns, past experience indicates that contractors' proposed prices have resulted in quality of service shortfalls. Results of the analysis may be used in performance risk assessments and responsibility determinations.

(capitalization and emphasis in original).

> Under section 8, the Solicitation explained the basis for the award:

> The award will be made based on the best overall (i.e., best value tradeoff process) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to three (3) evaluation factors on a trade-off basis: (1) Technical Capability, (2) Past Performance and (3) Price. All proposals shall be subject to evaluation by a Technical Evaluation Team (TET). Proposals will be evaluated according to the evaluation criteria stated above. In conducting its evaluation, the Government intends to determine which offer proposes the best value. Accordingly the Government may award any resulting contract to other than the offer proposing the lowest price or other than the offer achieving the highest rating. To receive consideration for award, a rating of no less than "**Acceptable**" must be achieved for the Technical Capability Factor. The Government is more concerned with obtaining superior technical features than with making an award at the lowest overall cost to the Government. However, the Government will not make an award at a significantly higher overall cost to the Government to achieve slightly superior technical or management features. No proposal shall be considered for award that fails to reflect the offeror's clear intent to provide the full amount of work described in this solicitation.

> In addition, USDA intends to award a contract without discussions with offerors but reserves the right to conduct discussions and/or negotiations with any and/or all offerors, as determined by the Contracting Officer to be necessary.

(capitalization and emphasis in original).

In response to the Solicitation, 11 offerors submitted proposals, including protester MCS and intervenor ISN, each of which submitted their proposals on May 28, 2019. MCS' initially offered price was $[redacted] for Task Order 1 (12 months), and $57,183,879.00 for the total IDIQ contract (18 months). According to the protestor's complaint, however, "[f]ollowing discussion questions received from USDA on August 29, 2019, MCS submitted an updated price proposal on September 4, 2019. In its updated proposal, MCS' proposed prices were reduced to $[redacted] for Task Order 1 and $[redacted] for the 18-month IDIQ." After discussions, ISN's final price proposals was $[redacted] for

9

Task Order 1 and $38,213,017.00 for the total ceiling price. After the updated proposals were received, the agency reached out to the ISN on January 2, 2020 with a request for clarification on two issues. First, to confirm that ISN understood "that 100% of the properties requiring Property Preservation Services will be located in Rural America?" to which ISN responded "yes," and second, to confirm that ISN fully understood "all of the PWS requirements for each of the service line items in which you submitted pricing for?" to which ISN responded "yes."

Regarding the technical capabilities and past performance factors of the offerors' proposals, the Technical Evaluation Team (TET) for the USDA RD documented its findings of the offerors' proposals in a Consensus Narrative Report, dated January 21, 2020. The TET ranked each of the 11 offerors' proposals for the Technical Capability Factor and Past Performance Factor as follows:

CONSENSUS SUMMARY RANKING OF PROPOSALS

| Evaluation Factor | Rating by Vendor | | | |
|---|---|---|---|---|
| | MCS | ISN | ████ | ████ |
| Technical Capability | Outstanding | Outstanding | Good | Good |
| Past Performance | Substantial Confidence | Substantial Confidence | Substantial Confidence | Satisfactory Confidence |

| Evaluation Factor | Rating by Vendor | | | |
|---|---|---|---|---|
| | ████ | ████ | ████ | ████ |
| Technical Capability | Good | Acceptable | Acceptable | Marginal |
| Past Performance | Satisfactory Confidence | Limited Confidence | Satisfactory Confidence | Satisfactory Confidence |

| Evaluation Factor | Rating by Vendor | | |
|---|---|---|---|
| | ████ | ████ | ████ |
| Technical Capability | Unacceptable | Unacceptable | Unacceptable |
| Past Performance | Satisfactory Confidence | Neutral Confidence | Neutral Confidence |

As indicated in the above table, protestor MCS and intervenor ISN submitted the only proposals to achieve both an "Outstanding" rating for the Technical Capability Factor, and a "Substantial Confidence" rating for the Past Performance Factor. Specifically, according to the TET, MCS submitted the best proposal for non-price factors, and the TET summarized its ratings as:

| OFFEROR: MORTGAGE CONTRACTING SERVICES (MCS) | CONSENSUS RATING |
|---|---|
| **Factor 1: Technical Capability & Subfactors** | **OUTSTANDING** |
| **Subfactor 1 Relevant Experience** | Outstanding |
| **Subfactor 2: Nationwide Coverage - Geographical Service Area** | Outstanding |
| **Subfactor 3: Management Approach, w/QASP** | Outstanding |
| **Subfactor 4: Staffing, and Key Personnel Resumes** | Outstanding |
| **Subfactor 5: Property Management System** | Outstanding |
| **Factor 2: Past Performance Confidence Rating** | Substantial Confidence* |

The TET ranked ISN was the second best proposal for non-price factors, and its ratings were summarized as:

| OFFEROR: Information Systems & Networks Corporation (ISN) | CONSENSUS RATING |
|---|---|
| **Factor 1: Technical Capability & Subfactors** | **OUTSTANDING** |
| **Subfactor 1 Relevant Experience** | Outstanding |
| **Subfactor 2: Nationwide Coverage - Geographical Service Area** | Outstanding |
| **Subfactor 3: Management Approach, w/QASP** | Outstanding |
| **Subfactor 4: Staffing, and Key Personnel Resumes** | Outstanding |
| **Subfactor 5: Property Management System** | Outstanding |
| **Factor 2: Past Performance Confidence Rating** | Substantial Confidence |

After evaluation, the agency selected ISN for award and the contracting officer Shelia Stoddard informed ISN that it had been selected for award on January 31, 2020. Subsequently, on February 5, 2020, Ms. Stoddard informed MCS that it had not been selected for award; and on February 11, 2020, the USDA RD issued a debriefing letter to MCS. With regard to MCS' price, the debriefing letter stated:

CLIN 001 Inspections - Pricing is comparable to the Competition Price Results (CPR) and comparable to CLIN 001 pricing for other competitive proposals. Therefore CLIN 001 is found fair and reasonable. However, for CLIN 002 Property Preservation Services, the individual service items on the price list are higher, especially in the case of [redacted], which are in most instances [redacted]% over the CPR and on the higher side of the competitive prices offered by the other offerors. Offeror as the incumbent, indicated their pricing is based on their respective cost experience, their technical approach and the nature of the work for rural America. Therefore, MCS's price is found realistic and in conformity for their proposed technical approach.

11

Summarily, CLIN 001 and 002 combined are higher than CPR (compared to other competitive prices) received with a technical rating of acceptable and above. In accordance with evaluation criteria set forth in Section M paragraph 4., "the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal." Therefore, notwithstanding, MCS' price finding to be competitive in price, they are not determined to be the best value to the Government in accordance with the evaluation criteria.

On February 18, 2020, MCS filed a protest of the award to ISN with the United States Government Accountability Office (GAO). In MCS' protest, MCS alleged that

USDA made numerous errors in its evaluation and award process under the Solicitation, resulting in its unreasonable and unsupportable determination to make award to ISN. First, ISN has an 'unequal access to information' organizational conflict of interest ("OCI") stemming from its work as a support contractor to the U.S. Department of Housing and Urban Development ("HUD"), through which ISN receives extensive proprietary and confidential information regarding MCS and other property preservation and inspection field operators. The Agency unreasonably failed to disqualify ISN based on that OCI. In addition, USDA failed to recognize the unrealistic nature of ISN's price proposal, which was apparently based on service pricing that would be appropriate for HUD's urban property portfolio, but will create significant performance issues in the context of USDA's rural properties. The Agency also unreasonably awarded ISN the highest possible ratings for Past Performance and Technical Capability. The information on ISN's own website makes clear that, under the Solicitation's stated evaluation criteria, ISN did not warrant the highest rating for either of those Factors. Finally, SDA incorrectly evaluated MCS' original price proposal, and failed to account for the updated pricing that MCS provided on September 4, 2019.

On February 19, 2020, the USDA issued a Stop Work Order to ISN, and in a February 28, 2020 letter to the GAO, counsel for the USDA RD responded to MCS' protest at the GAO, stating:

This letter is to notify GAO and the parties that the agency will take corrective action in the above-referenced bid protest. The agency has begun an investigation into the potential conflict of interest identified by the protester, the facts of which were unknown to the agency prior to the award. In addition, the agency identified errors in the evaluation process that could have affected the award decision. The agency will correct the errors and make a new and potentially different award decision, which will render moot the award decision now challenged by MCS. Accordingly, the agency requests that GAO dismiss the protest.

Thereafter, the GAO dismissed MCS' protest and the USDA RD took corrective action. On March 23, 2020, the agency issued an OCI Memo for the Record which determined that the employees at ISN who worked on the HUD contract who were alleged to have provided unequal information "provided no input and were not a part of the proposed team for this effort" and "[t]he quoted pricing by ISN provided under this procurement appears to be in line with commercial pricing, and in line with the other commercial competitive pricing of offeror's that were rated 'acceptable' in this competition." The March 23, 2020 OCI Memo for the Record concluded with the "Contracting Officer's Determination," which stated: "After investigating this claim and reviewing the supporting information from ISN, I have determined the OCI alleged by MSN does not exist, and I have not identified any other OCI. As such, a conflict of interest does not preclude ISN from award/performance of a contract with Rural Development for Property Preservation Services."

In addition to the OCI Memo for the Record, as part of the corrective action the USDA re-evaluated the 11 proposals submitted in response to the Solicitation. On April 6, 2020, the agency issued a Proposal Analysis Report. Regarding the USDA evaluation of MCS' proposal, the Proposal Analysis Report stated:

**2.1 OFFEROR 1: MCS          Consensus Rating: Outstanding**
**2.1.1 Offeror 1 – MCS - Key Technical Evaluation, Past Performance and Price Findings**

Summarily, MCS's proposal received an Outstanding overall rating, that demonstrated a strong technical foundation, relevant experience, nationwide coverage reaches, management and staffing capabilities and a solid property management system that would exceed all performance expectations of requirements in the PWS. There were multiple "Strengths" in all the Subfactors.

**Subfactor 1.1 Experience:**
**Strength(s**)
•      Demonstrated extensive experience property preservation and inspection services, [redacted]
**Weaknesses: None**
**Deficiency(ies) None**

**Subfactor 2.2 Nationwide Coverage:**
**Strength(s)**
•      [redacted] that can do both property preservation and inspections;
•      ability to retain rural vendors with a [redacted] % turnover rate;
•      [redacted]

**Weaknesses: None**
**Deficienc(ies) None**

**Subfactor 1.3 Management Approach/QASP:**
**Strength(s)**
- Demonstrated a management approach [redacted], ensures effective, cost-efficient work performance.
- Proven management processes ensure continued emphasis on customer-focused services [redacted];
- PM has [redacted] years of experience supporting the USDA-RD in all aspects of Property Preservation and Property Inspections program execution
**Weaknesses: None**
**Deficienc(ies) None**

**Subfactor 1.4 Staffing Plan, Key Personnel, Resumes Subcontractors; Subcontracting Plan**
**Strength(s)**
- Demonstrated maintenance of a strong national vendor network of approximately [redacted] vendors that are experienced in all areas of property preservation and inspections and includes an inspections network consisting of [redacted] vendors as well as a network of over [redacted] vendors [redacted]
- Dedicated [redacted]
- Demonstrated a subcontracting plan, that provides [redacted]% small business subcontracting opportunities, exceeding the mandated of [redacted]%.
- Demonstrated [redacted]
**Weaknesses: None**
**Deficienc(ies) None**

**Subfactor 1.5 Property Management System**
**Strength(s):**
- Demonstrated [redacted] an enhanced feature in its PMS, that uses [redacted] that have helped to [redacted] in a cost-effective manner.
- Demonstrated [redacted] – MCS has conducted [redacted]
**Weaknesses: None**
**Deficienc(ies) None**

**2.1.2 PAST PERFORMANCE**

**2.1.2.1 Performance Confidence Assessment - Observations and Conclusions**

Past Performance was rated as Substantial Confidence, with findings indicating that as the incumbent contractor, MCS had an overall record of [redacted], and several other contracts relevant in size and scope. There were no [redacted] reported. There were two Past Performance

Questionnaires received for review, in which it indicated MCS exceeded and met performance standards (Ref. PPET Report, Contract File Index B20).

## 2.1.3 PRICE FACTOR

### 2.1.3.1 Summary of Proposed and Evaluated Cost/Price

### (MCS) – Task Order 1 Price Compared to Competition Price Results (CPR)

| Task Order 1 | CLIN | PROPOSED PRICE | TO CLINs 1 & 2 | CPR CLINs 1 & 2 |
|---|---|---|---|---|
| Inspections | CLIN 001 | [redacted] | [redacted] | 3,395,537.00 |
| Property Preservations | CLIN 002 | [redacted] | [redacted] | 23,054,219.00 |
| | | | | |
| Reports/NSP | CLIN 003 | [redacted] | 0 | |
| Contingency PropPres | CLIN 004 | [redacted] | | |
| ODC's-Travel | CLIN 005 | [redacted] | | |
| Transition In/Out | CLIN 006 | [redacted] | 0 | |
| TOTAL TO CEILING | **PRICE** | [redacted] | | |
| COMPARISON CLIN TASK ORDER /CPR | **PRICE** | | [redacted] | $[redacted] |

COMPETITIVE PRICE CHART

| | ISN | [redacted] | [redacted] | [redacted] | MCS | [redacted] | [redacted] |
|---|---|---|---|---|---|---|---|
| CLIN 001 TOTAL IDIQ 18 | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| CLIN 001 TOTAL TASK ORDER | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| | | | | | | | |
| CLIN 002 TOTAL IDIQ 18 | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| CLIN 002 TOTAL TASK ORDER | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| | | | | | | | |
| BOTH CLINS TOTAL IDIQ 18 | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| BOTH CLINS TOTAL TASK ORDER 12 MONTH | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |

CLIN 001 Inspections - Pricing is below the CPR, and comparable to CLIN 001 pricing for ISN, [redacted] and [redacted]. Therefore CLIN 001 is found fair and reasonable.

CLIN 002 Property Preservation Services - The individual services items on the price list are higher, especially in the case of [redacted], which are in most instances [redacted]% TO [redacted]% over the CPR and on the higher side of the competitive prices offered by the offerors indicated in the competitive chart above, and found to be unreasonably high. Offeror as the incumbent, indicated their pricing is based on their respective cost experience, their technical approach and the nature of the work for rural America.

Summarily, CLIN 001 and 002 combined are higher than the CPR as shown in the table above and compared to other competitive prices received with a technical rating of acceptable or above. In accordance with evaluation criteria set forth in section M paragraph 4., "the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal."

Therefore, even though MCS's pricing is found to be realistic and in conformity for their proposed technical approach, their pricing is unreasonably high based on the comparative analysis performed for this solicitation. Therefore, MCS is not determined to be the best value in accordance with the evaluation criteria. MCS tied ISN in their technical rating with an "outstanding" but had an overall higher price. *Competition Price Results (Ref. B19 Price Proposal Evaluation-Price Competition Memo).

(capitalization and emphasis in original). Regarding ISN's proposal, the Proposal Analysis Report stated:

**3.1 OFFEROR 2 – ISN**            **Consensus Rating: Outstanding**

**3.1.1 Offeror 2 – ISN- Technical Evaluation, Past Performance and Price Findings**

ISN strongly demonstrated that they have the overall technical understanding and capabilities to successfully exceed the performance requirements of the solicitation's PWS. ISN demonstrated experience in all phases of property preservation services with a leadership team with over 50 year of property preservation and inspection services experience; Nationwide coverage was comprehensively demonstrated; a management plan and QASP that were premised on their being a Capability Maturity Model Integration (CMMI) Level 3 company; a thorough staffing plan was provided; with a PMS that surpass the requirements of the PWS. ISN consensus ranking was "Outstanding" in all the Factor 1 Subfactors; and their Past Performance Confidence Assessment was "Satisfactory Confidence." The multiple "Strengths" in Subfactors 1.1 to 1.5 "Strengths" are synopsized below

**Subfactor 1.1 Experience:**
**Strength(s):**
•      Robust Quality Control (QC) processes to review and confirm the quality and accuracy of inspection reports and photographs to determine necessary repairs and other work

- Subcontractor [redacted] experience to include their vendor network to cover all 50 states to include the needed territories
- Demonstrated experience on other federal contracts (USMS and HUD) providing services in most rural and remote areas
- Leadership team with over 50 years of PPIS experience
- Demonstrated a detailed experience in all phases of property preservation services
- Provided mitigation solutions for the challenges pertaining to property preservation in rural areas

**Weaknesses: None**
**Deficienc(ies) None**

### Subfactor 1.2 Nationwide Coverage:
**Strength(s):**
- Demonstrated strong nationwide coverage; with a network of [redacted] geographically disbursed inspectors and contractors
- Provided multiple Heatmaps to clearly demonstrate available personnel for current and future USDA PPIS requirements in all 50 US States and Territories

**Weaknesses: None**
**Deficienc(ies) None**

### Subfactor 1.3 Management Approach/QASP:
**Strength(s)**
- Offeror appraised as a Capability Maturity Model Integration (CMMI) Level 3 company, signifying their expertise in the best practices used to deliver continuous and reliable support services through structured management solutions
- Quality assurance: indicated staffing Independent QA team headed by a dedicated QA Manager
- Training and Ongoing Support delivered to nationwide staff that would cover RD's scope of work and administrative roles, responsibilities, policies and procedures
- Continuous Process Improvement (CPI )process to learn from previous mistakes
- Data Monitoring to ensure assigned timelines and quality metrics are met
- [redacted]

**Weaknesses: None**
**Deficienc(ies) None**

### Subfactor 1.4 Staffing Plan, Key Personnel, Resumes Subcontractors; Subcontracting Plan
**Strength(s)**
- Comprehensive training provided to all employee Offeror provided a rational on how it would manage nationwide coverage by [redacted]

**Weaknesses: None**
**Deficienc(ies) None**

**<u>Subfactor 1.5 Property Management System</u>**
**Strength(s):**
- [redacted] to keep timelines on track
- [redacted]
- Demonstrated a [redacted]

**Weaknesses: None**
**Deficienc(ies) None**

## 3.1.2 PAST PERFORMANCE FACTOR

### 3.1.2.1 Performance Confidence Assessment - Observations and Conclusions

ISN is assigned as Substantial Confidence. Summarily, Offeror provided substantial past performance both for ISN and its major subcontractor [redacted]. The proposal indicated three contracts for past performance, two performed by the prime and one performed by major subcontractor [redacted]. There were no CPARs or PIPRs [Past Performance Information Retrieval System] reported. The team received only one Past Performance Questionnaire for review. The questionnaire from HUD reflected a rating of "Five" (exceeds) in the areas of delivery performance and problem solving and a rating of "four" (meets and occasionally exceeds) in overall quality, quality of service, and quality of personnel (Ref. B20 Performance Evaluation Report).

## 3.1.3 PRICE FACTOR

### 3.1.3.1 Summary of Proposed and Evaluated Cost/Price

### (ISN) – Task Order 1 Price Compared to CPR

| Task Order 1 | CLIN | PROPOSED PRICE | TO CLINs 1 & 2 | CPR CLINs 1 & 2 |
|---|---|---|---|---|
| Inspections | CLIN 001 | [redacted] | [redacted] | [redacted] |
| Property Preservations | CLIN 002 | [redacted] | [redacted] | [redacted] |
| | | | | |
| Reports/NSP | CLIN 003 | [redacted] | 0 | |
| Contingency PropPres | CLIN 004 | [redacted] | | |
| ODC's-Travel | CLIN 005 | [redacted] | | |
| Transition In/Out | CLIN 006 | [redacted] | 0 | |
| TOTAL TO CEILING | **PRICE** | [redacted] | | |
| COMPARISON CLIN TASK ORDER /CPR | **PRICE** | | [redacted] | **$26,449,756.00** |

**COMPETITIVE PRICE CHART**

| | ISN | [redacted] | [redacted] | [redacted] | MCS | [redacted] | [redacted] |
|---|---|---|---|---|---|---|---|
| CLIN 001 TOTAL IDIQ 18 | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| CLIN 001 TOTAL TASK ORDER | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| | | | | | | | |
| CLIN 002 TOTAL IDIQ 18 | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| CLIN 002 TOTAL TASK ORDER | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| | | | | | | | |
| BOTH CLINS TOTAL IDIQ 18 | $28,418,630.00 | $31,648,267.00 | $35,921,357.00 | $40,811,827.00 | $[redacted] | $50,631,272.00 | $60,270,725.00 |
| BOTH CLINS TOTAL TASK ORDER 12 MONTH | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |

CLIN 001 Inspections - Pricing is below the CPR, and comparable to CLIN 001 pricing for MCS, [redacted] and [redacted]. Therefore CLIN 001 is found fair and reasonable.

CLIN 002 Property Preservation Services - The individual service items on the price list are lower than the CPR and is competitive with prices received as shown in the chart above. The Offeror indicated in their Vol 3 Price Proposal, that their pricing was "well researched, and was 100 percent compliant, based on existing rates, other Government work similar in nature, numerous independent surveys and market data which lower staffing in their approach." Further justification for pricing is that the offeror indicated through a clarification that they are aware this requirement is for rural America and that their pricing reflects that fact. Therefore, their price is found realistic and in conformity with their proposed technical approach.

The offerors combined CLIN 001 and 002 price is competitive with other offered prices, and in accordance with evaluation criteria set forth in section M paragraph 4., "the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal."

ISN tied MCS in their technical rating with an "outstanding" but had an overall lower price. ISN is found to be fair and reasonable and has been determined to be the best value with an outstanding technical rating and lowest price out of the two offerors whom received an outstanding rating*Competition Price Results (Ref. B19 Price Proposal Evaluation-Price Competition Memo).

(capitalization and emphasis in original).

After noting the 11 proposals, the Proposal Analysis Report focused on the two proposals submitted by MCS and ISN:

Both MCS and ISN were rated technically "Outstanding" but are as for pricing were at opposite ends of the CPR price spectrum, high to low respectively. MCS' pricing for the Task Order 1 at $[redacted] is [redacted]% higher than CPR; whereas ISN is significantly lower than CPR by 30% lower. Both MCS and ISN indicated their pricing was based on their respective historical pricing charges to their clients, both Government and private sector. Both Offerors having technically "Outstanding" ratings demonstrated clear understanding of the requirements, and their respective pricing is consistent with their technical approaches in their proposals.

**Technical Rating: Outstanding– ISN, MCS**

MCS pricing for Task Order 1 at $[redacted] is [redacted]% over the CPR, and not in line with the competitive price proposals received in response to the solicitation, which made its overall price a high outlier. MCS pricing is based on their historical pricing provided to USDA-RD for the past seven years; and their proposal indicated that their price proposal has been kept consistent with their existing USDA-contract. MCS pricing is found to be fair, reasonable, and realistic for the work to be performed when you take into consideration their exceptional technical approach. They offered a superior technical proposal with an overall Outstanding rating, as well as outstanding in all the subfactors and was assessed as Substantial confidence rating for past performance. However, their offer, as a high outlier, is not determined to be the best value to the Government under this solicitation.

ISN pricing on the Task Order 1 at $[redacted] was [redacted]% lower than the CPR, closer in line with the competitive price proposals received in response to the solicitation. ISN indicated that their pricing was based on their historical experience, research, and their technical approach using industry standard technology. ISN pricing was found to be fair, reasonable, and realistic for the work to be performed under the solicitation and in accordance with their exceptional technical approach. ISN offered a technical superior proposal with Outstanding ratings overall and in all the subfactors. They also were assessed a Substantial Confidence rating in Past Performance. With a superior technical proposal and comparative competitive pricing, the Contracting Officer founds and recommends ISN as providing the best overall value to the Government for this solicitation. (See (Ref. B19 Cost/Price Proposal Evaluation – Price Competition Memorandum).

**4.1.2 Adequate Price Competition Determination**

As discussed above four(4) of the eleven(11) offerors competing for the Property Preservation and Inspection contract were determined not to have submitted technical acceptable proposals: CWIS (Marginal); IEI, NHC, UFS (all "Unacceptable"). That left remaining seven(7) that were considered to have a technically "Acceptable" proposals that rated from Acceptable-

Good-Outstanding. Of the seven(7), technical acceptable proposal, their pricing for Task Order 1, has a CPR of approximately $25M to $28M, on the CPR price spectrum.

Therefore, based on the foregoing findings, and because multiple offers were received from several offerors that were considered responsible and were competing independently for the subject contract, the Technical Evaluation Team (TET) and the Source Selection Authority (SSA) determined that, in accordance with the provisions of FAR 15.403-1, Adequate Price Competition did exist for the procurement.

In evaluating price, it was indicated in the solicitation, Attachment C-4, Instructions to Offerors, Evaluation and Basis for Award, par. 4, that "Price is not an adjectivally rated Factor; however, the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all nonprice factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal.

Upon information above, and upon performing an integrated assessment of technical (including past performance) and price this competition came down to ISN and MCS, both providing technical exceptional proposals, and competitive pricing as being in line for award. However, in accordance with the solicitation and the CO's determination and recommendation in the Price Competition Memorandum, of the two exceptionally technically equal offerors, ISN, as the lowest price, provides the best overall value to the Government, with a technically superior proposal at a price that is comparatively competitive, fair and reasonable, balanced and realistic for the work.

Therefore, there is no need for establishing a competitive range and going into discussions, because two highly rated exceptional proposals were received and there are no improvements required from either a technical or cost standpoint. There is no basis for a tradeoff between ISN and MCS due to MCS did not supply any features which would warrant the premium in price offered over the lower price offered from ISN. Best value has been established with a superior technical proposal, with substantial past performance confidence rating, and reasonable, balanced and realistic pricing, all resulting in no risk to contract performance.

. . .

## 5. AWARD RECOMMENDATION

### 5.1 Source Selection Recommendation

After performing an integrated analysis, the TET Chair & the Contracting Officer hereby recommend to the SSA, awarding to the offeror, Information Systems & Networks Corporation (ISN), the offeror that submitted a proposal under the solicitation that was rated technically superior with an "Outstanding" with pricing that is considered both reasonable, balanced and realistic for the work.

Therefore, IAW the terms and conditions set forth in the Property Preservation and Inspection Services, Request for Proposal (RFP), Solicitation 12SAD119R0003, the SSB [Source Selection Board] determined that the proposal submitted by ISN offered the best overall value for satisfying the Government's stated requirements. The RFP if award would be made to the offeror whose proposal represented the best value to the government using a competitive combination source selection approach. Proposals were evaluated for "Technical Merit" and was rated "Outstanding" and with past performance was assessed as "Substantial Confidence" and the pricing was considered reasonable, balanced and realistic for the work. In adhering to RFP instructions, terms and conditions, the SSB is recommending to the SSA Panel that, "**INFORMATION SYSTEMS & NETWORKS CORPORATION**" be selected as the contract awardee based on a "Best Value Decision." It is imperative that this Source Selection Competitive contract be awarded to an offeror that has proven technical capabilities to ensure no interruptions in property preservation and inspections service to occur. Since **INFORMATION SYSTEMS & NETWORKS** exceeds the technical criteria established in the RFP and offered a fair and reasonable for the Total Evaluated Price for the 12-month Task Order 1, of **$[redacted] and the 18-month base** IDIQ ceiling at **$34,983,380.58,** as determined by "Adequate Price Competition, **INFORMATION SYSTEMS & NETWORKS CORPORATION** is clearly the offeror representing the Best Value to the USDA-RD for the Property Preservation and Inspection Services acquisition. Therefore, the TET Chair and the Contracting Officer puts forward, as a recommendation to the SSA, that **INFORMATION SYSTEMS & NETWORKS** be awarded this contract.

(capitalization and emphasis in original).

The contracting officer, Shelia Stoddard, also issued a Price Competition Memo, dated May 29, 2020, which explained that "[a]s part of a Corrective Action Plan, the original cost proposals where [sic] re-evaluated." With regard to MCS' pricing, the Price Competition Memo stated:

CLIN 001 Inspections - Pricing is below the CPR, and comparable to CLIN 001 pricing for ISN, [redacted], [redacted] and [redacted]. Therefore CLIN 001 is found fair and reasonable.

CLIN 002 Property Preservation Services - The individual services items on the price list are higher, especially in the case of [redacted], which are in

22

most instances [redacted]% to [redacted]% over the CPR and on the higher side of the competitive prices offered by the offerors indicated in the competitive chart above. The offeror as the incumbent offered their historical pricing, which have been used the past four years. The offeror maintains the realism of their pricing based on their respective cost experience, their technical approach and the nature of the work for rural America. Summarily, CLIN 001 and 002 combined are higher than the CPR as shown in the table above and compared to other competitive prices received with a technical rating of acceptable or above. This results in their Task Order 1 pricing of $[redacted] approximately $[redacted] higher than the CPR, and for the IDIQ priced at $[redacted] is approximately $[redacted] over the estimated CPR of $[redacted]. Although MCStechincal [sic] rating is outstanding, pricing is at the higher end of the CPR, and is much higher than other similar ranked proposals which precludes them from being in line for an award. Note, in accordance with evaluation criteria set forth in Section M paragraph 4., "the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal."

(capitalization in original).

With regard to ISN's pricing, the Price Competition Memo stated:

CLIN 001 Inspections - Pricing is in line with the CPR, and comparable to CLIN 001 pricing for MCS, [redacted] and [redacted]. Therefore CLIN 001 is found fair and reasonable.

CLIN 002 Property Preservation Services - The individual service items on the price list are lower than the CPR, however, are competitive with prices received as shown in the chart above. The Offeror indicated in their Vol 3 Price Proposal, that their pricing was "well researched, and was 100 percent compliant, based on existing rates, other Government work similar in nature, numerous independent surveys and market data which lower staffing in their approach." Further justification for pricing is that the offeror indicated through a clarification that they are aware this requirement is for rural America and that their pricing reflects that fact.

The offerors combined CLIN 001 and 002 price is competitive with other offered prices, and in accordance with evaluation criteria set forth in section M paragraph 4., "the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal."

ISN tied MCS in their technical rating with an "outstanding" but had an overall lower price. ISN pricing at $[redacted] for Task Order 1; and, IDIQ

23

18-month ceiling of $$34,983,380.00 is found to be fair and reasonable. Their pricing is also determined to be realistic in accordance with their technical approach and understanding of the work, as demonstrated in their "outstanding" technically rated proposal and through clarification, as stated above.

(capitalization in original).

Under the heading labeled "**CONTRACTING OFFICER RECOMMENDATION**," the Price Competition Memo stated:

Best Value/Trade-Off. It is found that a trade-off analysis is not required based on my findings in the technical and pricing received from all offerors which had a lower technical rating and higher price than the recommended awardee. Technically, two offerors were rated "outstanding" and there were no discriminators in their technical ratings to lean towards performing a tradeoff.

The only discriminator, as indicated below is the divergent pricing, with MCS on the higher spectrum of the CPR, and ISN on the lower side. Note, the solicitation indicated that where all "non-price factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal." That is the case as noted below in this competition, where CLINs one and two were evaluated for the task order.

(capitalization and emphasis in original). The Price Competition Memo concluded that ISN's proposal was "the best value with an outstanding technical rating and lowest price out of these two offerors who both received outstanding ratings," and recommended to the Source Selection Authority that ISN be awarded the contract.

On May 29, 2020, the agency issued the Source Selection Decision Document which stated, in part:

### 4. INDEPENDENT ANALYSIS – FACTORS 1 AND 2

I have accomplished an independent analysis of the information provided in order to accomplish an integrated assessment of the findings of my TET. As noted in the above chart in paragraph 3.1, Factor 1 Overall Ratings indicated that out of the eleven offerors competing for the Property Preservation and Inspection Services solicitation, two were rated rating "Outstanding,", MCS and ISN. Three Offerors rated as "Good", namely, [redacted]; and then two rated "Acceptable", [redacted]. CWIS rating was "Marginal" and lastly, [redacted] were all rated "Unacceptable".

24

**5. INTEGRATED ASSESSMENT AND SOURCE SELECTION**

The solicitation indicated that to be considered for award, Offerors must be rated overall as "Acceptable". Since [redacted] were rated below "Acceptable," and had pricing issues ranging from not fair, reasonable, realistic, or balanced, incompliant with the solicitation, their proposals were found to be un-awardable for this solicitation requirement. Five of the Offerors ([redacted]) were rated "Acceptable" to "Good". Overall, my review concurs with the finding that their respective ratings ranging from "Acceptable" and "Good", does not demonstrate the highest understanding of the requirement, and therefore un-awardable for this solicitation requirement. Two of the Offerors, ISN and MCS, both rated "Outstanding" demonstrating that their technical proposals provided the highest understanding of the requirement. In addition, both Offerors were assessed Past Performance Confidence rating of "Substantial. However, the greatest discriminator between the Offeror's proposal was in their pricing. MCS pricing was higher and outside of the competitive pricing of other acceptable offerors; whereas, ISN's pricing was the lowest, and comparable to the competitive pricing from other CPR range Offerors. Below is an integrated assessment for both MCS and ISN proposals.

**<u>Information Systems and Network Corporation</u>**
ISN submitted a superior technical proposal with an overall rating of "Outstanding" in Technical Factor 1, as well as for Subfactor 1.1 thru 1.5. Substantial Confidence was their past performance assessment. As for pricing, their price proposal was found to be fair, reasonable, balanced and realistic for the work to be performed in rural America, in addition to being aligned with their technical approach. Also, it is noted that ISN provided an affirmative response to the clarification question as to their understanding that their pricing was realistic for rural America.

ISN' [sic] proposal demonstrated their relevant experience that far exceeded the solicitation requirement needs. Under Subfactor 1.1, Experience, they have extensive experience in property preservation and Inspection services – REO and foreclosure, to rural and remote areas. ISN contracted with the U.S. Marshals Service (USMS) for 6-years delivering asset management services to a portfolio of over [redacted] seized or forfeited to the Department of Justice (DOJ) Assets Forfeiture Fund and been working with the Department of Housing and Urban Development (HUD) National Servicing Center's Mortgagee Compliance Manager (MCM) since 2015, servicing over [redacted] properties per year. For Subfactor 1.2, Heatmap, ISN demonstrated thoroughly their capability to provide the available personnel and used multiple heatmaps indicating vendor/subcontractor coverage to all the United States and its Territories. ISN also provided a plan for servicing properties located in Western Pacific US Territories, if needed. Under Subfactor 1.3, ISN's management

approach was strongly demonstrated via and extensive Project Management Plan, that [redacted]. One of their strong attributes is that they are a Capability Maturity Model Integration (CMMI) Level 3 company, which indicates ISN are experts and efficient at using best practices to deliver continuous and reliable support service through structured management solutions. Their proposal also indicated a robust QA team which would have a dedicated QA Manager. Subfactor 1.4, Staffing, Key Personnel, etc. it was demonstrated that the ISN had a thorough staffing plan that would provide nationwide staffing coverage [redacted]. The staffing plan included a detailed narrative on their ability to identify, recruit, screen, onboard, train and retain quality candidates with relevant property preservation experience, including proposed head count at all levels to ensure they can meet the requirements of the PWS. Also, their plan demonstrated ramp-up capabilities. [redacted] ISN's subcontracting plan at [redacted]% for small businesses, exceeds the 22% RD/SBA [Small Business Administration] goal as stipulated in the solicitation. Subfactor 1.5 Property Management System (PMS), it was demonstrated that the Offeror's PMS exceeds the requirement's needs. ISN utilize the software tool "Salesforce" which will fully integrate with USDA LoanServe. ISN system was noted as being able to be [redacted]

ISN Past Performance Confidence rating of "Substantial" was reviewed and assessed on information reviewed by the TET on three contracts. Two of the contracts ISN was the Prime and with the third contract performed by their major proposed subcontractor [redacted]. The ISN prime contract values ranged from $22M to 42M, which is comparable in size and scope to this solicitation requirement. There were no CPARs on record. A Past Performance Questionnaire from HUD was received reflecting "Five" (exceeds) in the areas of delivery performance and problem solving and a rating of "four" (meets and occasionally exceeds) in overall quality, quality of service, and quality of personnel.

Overall pricing for the Task Order 1 of $[redacted], is aligned with the CPR, and other comparatively priced offerors submitted in response to this solicitation requirement. Further, pricing for some of the individual service items appear to be aligned with the corrective action Attachment 2, Unit Price Analysis, which was an average of other agency's public price lists. Therefore, their pricing was deemed fair, reasonable, realistic and balanced for the work under this requirement with the unique feature different from other property preservation contracts in that in the commercial market this work is most often in rural areas that are oftentimes difficult to reach. Therefore, I concur with the TET, and the Contracting Officer's recommendation that ISN's proposal is determined to be the best value in accordance with the evaluation criteria discussed in the solicitation.

**Management Contracting Services, LLC (MCS)**

MCS submitted a superior technical proposal with an overall rating of "Outstanding" in Technical Factor 1, with Subfactor 1.1 thru 1.5 Outstanding; Substantial Confidence past performance assessment. Although a high outlier, their pricing was found to be fair, reasonable, balanced and realistic for the work to be performed in rural American and aligned with their technical approach.

MCS' proposal demonstrated they had the relevant experience that exceeded the requirement needs. MCS is presently the incumbent contractor. Under Subfactor 1.1, Experience, they have successfully provided property preservation and Inspection services to [redacted] properties. For Subfactor 1.2, Heatmap, MCS's provided a [redacted] areas stipulated in the solicitation. The Subfactor 1.3, their [redacted]; and their QASP was thorough and comprehensive. Findings under Subfactor 1.4, their Staffing information indicated that there is [redacted]. The subcontracting plan exceeded the [redacted]% SBA goal, indicating [redacted]%. Their PMS exceeds what is required by the solicitation [redacted].

MCS's Past Performance Confidence rating of "Substantial" was based on their successfully performing the requirement as the incumbent contractor; and two other contracts in the private sector.

MCS's Pricing for both the Task Order 1 and IDIQ are well over the respective CPR: Task Order 1 of $[redacted] ( CPR, $28,794,738.00); IDIQ ceiling $[redacted] (CPR $43,239,629.00) and even though deemed fair, reasonable, realistic and balanced in accordance with their technical approach, and historical pricing, their pricing is not competitive for this solicitation.

MCS' price for Task Order 1, at $[redacted] is approximately $[redacted] over ISN price of $21,288,840.00; and for the overall IDIQ is approximately $[redacted] higher. Therefore, I concur with the TET, and the Contracting Officer's evaluation that MCS's proposal is not determined to be the best value in accordance with the evaluation criteria discussed in the solicitation.

The solicitation, under Attachment C4, par. 4, entitled Competition Instructions, Evaluation and Basis for award, it is [sic] stated that:

> "Overall, Non-Price Factors, when combined, are significantly more important than Price. Price is not an adjectivally rated Factor; however, the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all nonprice factors being

evaluated are virtually the same, best value may be represented by the lowest-priced proposal".

Upon reviewing the information provided by the TET, as summarized above for the two technically highest rated Offerors, it is determined that Offeror, **Information Systems and Network Corporation** clearly provided the best value proposal, all factors considered. Their proposal was technically outstanding as well as appropriately priced and aligned with their technical approach to the solicitation requirement.

In my integrated assessment, I reviewed, in detail, both the merits and confidence ratings achieved by the highest rated offerors across the spectrum of evaluation factors and subfactors to select, with certainty, the most highly rated and qualified offeror, given the importance of the individual factors, for this solicitation requirement.

In summary, the integrated assessment revealed that **INFORMATION SYSTEMS AND NETWORK CORPORATION** provided a proposal that generated the best overall value to the Government and yielded the greatest level of confidence that successful performance of the Property Preservation and Inspection Services will be realized.

(capitalization and emphasis in original). The Source Selection Decision Document concluded:

### 6. RECOMMENDATION FROM THE SSB

In accordance with the terms and conditions set forth in the "Property Preservation and Inspection Services" Request for Proposal RFP12SAD119R0003, the SSB determined that the proposal submitted by **INFORMATION SYSTEMS AND NETWORK CORPORATION** offered the best overall value for satisfying the USDA's stated requirements.

### 7. SUMMARY DETERMINATION

The RFP if award would be made to the offeror whose proposal represented the best value to the government using a competitive combination source selection approach. It also indicated, as noted above, "where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal".

ISN and MCS' proposals were both rated as superior proposals with both having key attributes that will successfully meet the Government's needs with no risk for this solicitation requirement. Their proposals were evaluated and found virtually the same, with no real differentiators between them technically that would require any tradeoff. However, the Offeror's were on

divergent ends in their respective pricing. ISN, is lower, for the Task Order 1 at $[redacted]; and MCS is higher, at $[redacted], which is a $[redacted] difference. And for the IDIQ, ISN overall pricing at $34,983,380.58, is approximately $[redacted] less than MCS overall pricing at $[redacted]. Therefore, the proposal from MCS did not supply any features which would warrant the significantly higher premium in price.

Therefore, after a thorough consideration it is determined that **INFORMATION SYSTEMS AND NETWORK CORPORATION** superior technical solution combined with the cost/price savings of $14.8M on the Task Order 1 and overall on the IDIQ of $22.2M, and past performance assessment of "Substantial Confidence" is a better value to the Government than MCS's higher priced technical proposal.

In summary, based on my integrated assessment of the proposals, and in accordance with the evaluation criteria, set forth in the solicitation, for the "Property Preservation and Inspection Service" it is my decision that the proposal submitted by **INFORMATION SYSTEMS AND NETWORK CORPORATION** represents the best overall value to the Government. I direct contract award to **INFORMATION SYSTEMS AND NETWORK CORPORATION**.

(capitalization and emphasis in original).

On May 29, 2020, the contracting officer sent a letter to ISN, which stated in part, "the stay of contract has been lifted. The agency has resolved the corrective action for the issues alleged in the protest that was filed. As of this date your company can proceed with work under this contract." The same day, May 29, 2020, the contracting officer sent MCS a letter which stated:

The Agency has completed the corrective actions described in its submission to GAO dated February 28, 2020, in bid protest B-418483, and has determined that no Organizational Conflict of Interest (OCI) existed with respect to awardee ISN. In addition, the Agency determined that errors identified in the evaluation process had no effect on the award decision. Accordingly, the stay of performance imposed on ISN that was triggered by your bid protest has been lifted and the transition of services will resume.

(capitalization in original).[3] Also on May 29, 2020, MCS requested a debriefing after the revised award to ISN, but the contracting officer declined, explaining in a May 29, 2020 email:

---

[3] It is unclear what the errors during the initial evaluations or why the "errors identified in the evaluation process no effect on the award decision."

> Consistent with its corrective action notice, the agency has revised its award documentation to reflect the results of the OCI investigation and the correction of identified errors, none of which resulted in a different award decision. Because the decision to award the contract to ISN was merely confirmed, and no new award decision was made, you are not entitled to a debriefing. The information provided in your original debriefing remains unchanged. Except that in the original debrief there was a typographical error in IDIQ Ceiling Price for ISN where it said $[redacted] , and it should have been $34,983,380.58.

(capitalization in original).

On June 5, 2020 MCS filed a second protest with the GAO, and alleged, "[t]his Protest follows corrective action that USDA took in response to a previous bid protest that MCS filed with your Office, B-418483. USDA informed MCS of its decision to again make award to ISN following the completion of its corrective action process on May 29, 2020." MCS also stated that "rather than remedy the mistakes in its original evaluation through corrective action, the Agency has repeated and compounded its errors." MCS alleged that

> USDA's new determination to once again make award to ISN is unreasonable and unsupportable. First, ISN has an 'unequal access to information' organizational conflict of interest ("OCI") stemming from its work as a support contractor to the U.S. Department of Housing and Urban Development ("HUD"), through which ISN receives extensive proprietary and confidential information regarding MCS and other property preservation and inspection field operators. The Agency unreasonably failed to disqualify ISN based on that OCI and ISN's failure to disclose that it had an actual or potential OCI. In addition, USDA failed to recognize the unrealistic nature of ISN's price proposal, which was apparently based on service pricing that would be appropriate for HUD's urban property portfolio, but will create significant performance issues in the context of USDA's rural properties. The Agency also unreasonably awarded ISN the highest possible ratings for Past Performance and Technical Capability. The information that was on ISN's own website at the time of award makes clear that, under the Solicitation's stated evaluation criteria, ISN did not warrant the highest rating for either of those Factors. Finally, USDA incorrectly evaluated MCS' original price proposal, and failed to account for the updated pricing that MCS provided on September 4, 2019.

(capitalization and quotation marks in original).

On September 10, 2020, the GAO issued its decision and denied all MCS protest grounds. See generally Mortg. Contracting Servs., B-418483.2, B-418483.3, 2020 WL 6625956 (Comp. Gen. Sept. 10, 2020). Regarding the organizational conflict of interest, the GAO found that "the agency meaningfully investigated the alleged OCI and, based on that investigation, reasonably concluded that the invoice information at issue did not

provide ISN with an unfair competitive advantage," and noted that "the contracting officer also determined that access to the invoice information was restricted to certain ISN personnel that had no involvement in the proposal effort," the GAO determined "that the agency reasonably concluded that ISN did not derive an unfair competitive advantage from its role on the HUD contract." Id. at *4-5. With regard to MCS' Past Performance allegations, the GAO explained:

> While the protester notes aspects of two of ISN's contracts that were dissimilar to the instant effort, the evaluation record demonstrates that ISN's overall past performance and experience supports the agency's assigned ratings. In this respect, ISN submitted two contract references involving property management services, including a contract performed by ISN's subcontractor with a value of $425 million. The third contract, the HUD contract, involved the provision of portfolio management services for approximately 60,000 properties per year. While such services were merely "related to" property preservation and inspection services, we find that the agency nonetheless acted reasonably in considering the HUD contract as part of ISN's overall past performance and relevant experience. In sum, we find that the agency reasonably found that ISN's overall experience and past performance were relevant and merited the high ratings assigned to ISN under those factors.

Id. at *8 (internal references omitted). Regarding price, the GAO likewise found "the agency's evaluation to be reasonable," explaining:

> In this regard, the agency compared ISN's prices to two benchmarks, the CPR and the AAP. For CLIN 0002, ISN's task order and IDIQ contract prices were more than [DELETED] percent lower than the CPR, but this gap was reduced for the overall IDIQ and task order ceiling prices (19 percent and 26 percent respectively). And, ISN's total prices were largely in line with the AAP pricing index, a benchmark created based on similar federal agency price lists. The protester argues that ISN's pricing is only in line with the AAP because the benchmark is based on the same flawed HUD data set used to create ISN's pricing. We note, however, that the AAP was not based only on prices from HUD properties but was also based on price lists from the Department of Veteran Affairs, FannieMae and FreddieMac. While the protester contends that these other agency pricing lists also do not reflect the realistic costs associated with servicing the rural properties involved in this procurement, we find this assertion to be largely unsupported.

> In addition to these price comparisons, the agency considered the explanation provided by ISN for its pricing, which was that the pricing was "well researched, and was 100 percent compliant, based on existing rates, other Government work similar in nature, [and] numerous independent surveys and market data." The agency further issued a clarification asking ISN if it was aware that the requirement is for rural America and if their pricing reflects that fact, to which ISN responded in the affirmative.

We conclude that this analysis was reasonable. While the protester asserts that the agency should have examined ISN's pricing with more scrutiny, we find that the depth of the USDA's analysis fell within the sound exercise of its discretion. *See Citywide Managing Servs. of Port Washington, Inc., supra.* We also find that the agency's use of a second benchmark (the AAP) was a reasonable further step to consider and compare the pricing received to the pricing received by other agencies for similar services, and find no support for the protester's assertion that this extra step was arbitrary or unnecessary. The protest is denied.

Mortg. Contracting Servs., LLC, B-418483.2, B-418483.3, 2020 WL 6625956, at *9-10 (capitalization and brackets in original) (internal references omitted).

On September 18, 2020, the protestor filed the above captioned bid protest in the United States Court of Federal Claims and alleged four counts: First, "USDA unreasonably evaluated ISN's Past Performance Factor," second, "USDA unreasonably evaluated ISN's relevant experience subfactor," third, "the agency unreasonably evaluated ISN's price realism," and fourth, "the agency made an unreasonable award determination."[4] Additionally, MCS asserts it has standing to bring the bid protest as an "interested party" upon an allegation of the "USDA's unreasonable evaluation of ISN's proposal and the USDA's arbitrary and capricious determination that ISN represented the best value in accordance with the Solicitation," and that but for the USDA's "unreasonable actions, MCS would have had a substantial likelihood of receiving award."

After an initial hearing with the parties, on October 1, 2020, protestor filed a motion for preliminary and permanent injunctive relief. Consistent with the complaint, protestor alleged that the "USDA unreasonably gave ISN a Substantial Confidence rating for Past Performance," the "USDA Unreasonably Rated ISN as Outstanding for [Technical] Factor 1, Subfactor 1," and the "USDA failed to properly evaluate ISN's unrealistically low pricing." Additionally, regarding protestor's claim in the amended complaint, that the USDA irrationally failed to assign a deficiency to ISN's proposal, MCS alleged the "Solicitation included a clear requirement that PWS Tasks 1-6 be performed in accordance with the following AQL [Acceptable Quality Levels]: '95% of tasks will be completed within 10 days. The remaining 5% will be completed within 21 days unless there is an exception granted by the Government.'" Protestor argued that "ISN did not meet the AQL requirement to perform 95% of each of PWS Tasks 1-6 within 10 days. Instead, for each of those Tasks, ISN proposed to perform 95% of the work within 14 days," and the "USDA should have assigned ISN a Deficiency in accordance with the Solicitation's stated evaluation criteria."

On October 3, 2020, defendant responded to protestor's claims, first arguing that MCS lacks standing to bring the protest as "the agency determined that because MCS's proposal price was unreasonably high, MCS could not be in line for the award," and "there

---

[4] Protestor did not raise the issue of organizational conflict of interest at the United States Court of Federal Claims as it had in both GAO protests.

is no substantial chance that MCS would have received the contract award, and the Court should dismiss this protest for lack of standing." On the merits defendant argued that

> [a]s it relates to MCS's challenge of the agency's evaluation of ISN's technical and past performance proposal, MCS contends that ISN does not meet the "Relevant Experience" and "Past Performance" requirements. MCS reads into the solicitation language that is not there. MCS complains that ISN's past performance examples did not involve precisely the same type and quantity of work as the present contract. But those requirements are absent from the solicitation, and MCS's argument is meritless in that absence.

Defendant further argued, "[a]s it relates to MCS's challenge of ISN's pricing proposal, MCS complains that ISN's pricing was unrealistically low. MCS cites nothing in support of this argument beyond its own assessment that performing the scope of work would cost more than ISN's proposed price." Regarding protestor's additional claim, defendant argued that "MCS ignores that the solicitation required the agency to evaluate an offeror's Technical Approach under five sub-factors. MCS fails to identify the relevant sub-factor (Management Approach) under which the agency evaluated the narrative and fails to cite the evaluation criteria for the relevant sub-factor."

Also on October 3, 2020 intervenor filed its opposition to protestor's motion for injunctive relief, first alleging that MCS does not have standing to bring suit for the injunction, and, second, if MCS does have standing, MCS would not succeed on the merits because the USDA's past performance evaluation was reasonable, the USDA properly evaluated the ISN proposal in Technical Capacity subfactor 1.1, the USDA properly evaluated the price realism of the ISN proposal, and that evaluation should be upheld. Regarding protestor's additional claim in the amended complaint, ISN argued that "[a] full and fair read of ISN's proposal" "shows that ISN repeatedly confirmed it would meet all required timeframes," and the "USDA reasonably determined that ISN's proposal met the Solicitation's requirements."

After all the submissions were reviewed, and in response to the agency's request that a decision be made as soon as possible, the court issued an oral decision to the parties, and explanation of its decision. The court's oral decision granted protestor's motion for injunctive relief, effective immediately. As noted above, this decision incorporates and memorializes the oral decision.

## DISCUSSION

Rule 52.1(c)(1) (2020) of the Rules of the United States Court of Federal Claims (RCFC) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) see also Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)); see also AAR Manufacturing, Inc. v. United States, 149 Fed. Cl. 514, 522 (2020);

Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004). In Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345 (Fed. Cir. 2004), the Federal Circuit explained that "[u]nder the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Id. at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); see also Palantir USG, Inc. v. United States, 904 F.3d 980, 990 (Fed. Cir. 2018); AgustaWestland North Am., Inc. v. United States, 880 F.3d 1326, 1332 (Fed. Cir.

34

2018); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350-51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)))), reh'g and reh'g en banc denied (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[5] see also Veterans

---

[5] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>   (B) contrary to constitutional right, power, privilege, or immunity;
>   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>   (D) without observance of procedure required by law;
>   (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>   (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Contracting Grp., Inc. v. United States, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015)); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531-32 ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)), subsequent determination, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 199 (2019); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal dismissed, 559 F. App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 382; Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the United States Court of Appeals for the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1332 ("Where, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

"Contracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process,'" PAI Corp. v. United States, 614 F.3d at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332), and "[a]ccordingly, procurement decisions are subject to a 'highly deferential rational basis review.'" Id. (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

When the contracting officer's discretion grows, so does the burden on the protestor. As noted in D & S Consultants, Inc. v. United States:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting

39

officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (internal citations omitted)); Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. 106, 113 (2010); Serco v. United States, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. 550, 555 (2017); FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014), appeal dismissed (Fed. Cir. 2015); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. at 496. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); IT Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. 158, 173 (2017) (citing Bannum v. United States, 404 F.3d at 1357-58; Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'" (citation omitted)).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

Past Performance

Regarding the agency's evaluation of ISN's past performance, MCS argued that the "USDA failed to follow the Solicitation's stated criteria in evaluating ISN's Past Performance submission. In particular, USDA failed to recognize that two out of ISN's three Past Performance examples did not meet the Solicitation's established criteria for relevance." Defendant responded that the USDA's Past Performance evaluation was reasonable and in accordance with the Solicitation," and intervenor similarly argued that the "USDA's past performance evaluation was reasonable."

Consistent with the above arbitrary or capricious standard, a Judge of the United States Court of Federal Claims explained, "[i]n the bid protest context, the assignment of a past performance rating is reviewed 'only to ensure that it was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion.'" Todd Constr., L.P. v. United States, 88 Fed. Cl. 235, 247 (2009) (quoting Clean Venture, Inc., B-284176, 2000 WL 253581, at *3 (Comp. Gen. Mar. 6, 2000)), aff'd, 656 F.3d 1306 (Fed. Cir. 2011); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 911 (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. at 785 (It is a "'well-recognized' principle that 'an agency's evaluation of past performance is entitled to great deference.'" (quoting Al Andalus Gen. Contracts Co. v. United States, 86 Fed. Cl. 252, 264 (2009) (citing Westech Int'l, Inc. v. United States, 79 Fed. Cl. 272, 293 (2007)))); SP Sys., Inc. v. United States, 86 Fed. Cl. 1, 23 (2009) (A "past performance evaluation 'will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.'" (quoting Consol. Eng'g Servs., Inc. v. United States, 64 Fed. Cl. at 637)). "'When the Court considers a bid protest challenge to a past performance evaluation conducted in the course of a negotiated procurement, "the greatest deference possible is given to the agency."'" FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 396 (2011) (quoting Univ. Research Co. v. United States, 65 Fed. Cl. 500, 505 (2005) (quoting Gulf Grp., Inc. v. United States, 61 Fed. Cl. at 351)); see also Plasan N. Am., Inc. v. United States, 109 Fed. Cl. 561, 572, appeal dismissed (Fed. Cir. 2013); Fort Carson Support Servs. v. United States, 71 Fed. Cl. 571, 598 (2006) ("Evaluation of past performance is 'within the discretion of the contracting agency and will not be disturbed unless it is unreasonable or inconsistent with the terms of the solicitation or applicable statutes or regulations.'") (quoting Consol. Eng'g Servs. v. United States, 64 Fed. Cl. 617, 637 (2005))). Likewise, the court in Seaborn Health Care, Inc. v. United States, wrote:

> A similar deferential standard applies when the Court is reviewing an agency's assessment of past performance evaluations. Commissioning Solutions Global, LLC v. United States, 97 Fed. Cl. 1, 9 (2011) ("[I]n cases such as this, when a negotiated procurement is involved and at issue is a performance evaluation, the greatest deference possible is given to the agency—what our Court has called a 'triple whammy of deference.'") (quoting Gulf Grp., Inc. v. United States, 61 Fed. Cl. 338, 351 (2004))); see also Blackwater Lodge & Training Center Inc. v. United States], 86 Fed. Cl. 488, 493 (2009) ("mere disagreement" with past performance evaluations is insufficient to disturb agency's decision).

Seaborn Health Care, Inc. v. United States, 101 Fed. Cl. 42, 48 (2011). Continuing, the court stated:

> In evaluating an offeror's past performance, FAR 15.305(a)(2) affords agencies considerable discretion in deciding what data is most relevant. PlanetSpace Inc. v. United States, 92 Fed. Cl. 520, 539 (2010). "Thus, when evaluating an offeror's past performance, the [contracting officer] 'may give unequal weight,' or no weight at all, 'to different contracts when [the

contracting officer] views one as more relevant than another.'" Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 718 (2010) (quoting SDS Int'l, Inc. v. United States, 48 Fed. Cl. 759, 769 (2001)).

Seaborn Health Care, Inc. v. United States, 101 Fed. Cl. at 51 (modifications in original); see also Fluor Intercontinental, Inc. v. United States, 147 Fed. Cl. 309, 329 (2020); Torres Advanced Enter. Sols., LLC v. United States, 133 Fed. Cl. 496, 531 (2017) ("When a protestor challenges a procuring agency's evaluation of past performance, the court's review is limited to ensuring that the evaluation was reasonable and performed in accordance with the solicitation; in other words, the procuring agency's evaluation is entitled to great deference."); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. at 787. "The court must especially defer to the agency's technical evaluations, past performance ratings, and other 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials.'" J.C.N. Constr., Inc. v. United States, 107 Fed. Cl. 503, 510 (2012) (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449), subsequent determination, 2013 WL 593479 (Fed. Cl. Feb. 15, 2013). A Judge of this court also has determined that, in a negotiated performance, a protestor must overcome a "triple whammy of deference by demonstrating by a preponderance of the evidence that the SSA lacked *any* rational basis" to assign a given past performance rating. Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. 99, 117 (2003), appeal dismissed, 89 F. App'x 741 (Fed. Cir. 2004) (emphasis in original); see also CGS Adm'rs, LLC v. United States, 110 Fed. Cl. 431, 450 (2013) (stating that "past performance evaluations in this type of procurement are accorded a 'triple whammy of deference'" (quoting Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. at 117)); Plasan N. Am., Inc. v. United States, 109 Fed. Cl. at 572; Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 243 (2011). Despite the foregoing, although highly deferential, the court's review of an agency's past performance evaluation is neither an automatic endorsement of the agency's actions nor tolerant of observable mistakes and each past performance evaluation must be reviewed on a fact-specific basis.

As indicated above, in the above captioned protest, for the Past Performance Factor, the Solicitation stated:

**FACTOR 2 – Past Performance**
The past performance confidence assessment rating is based on the offeror's overall record of recency, relevancy, and quality of performance. In addition, for large business concerns, the Government will evaluate past performance to determine the extent to which offeror has attained applicable goals for small business participation under prior contracts that required subcontracting plans. Relevant experience must be demonstrated within the last three years of providing property preservation and inspection services as required in the PWS. Specifically, a review of record of quality of service, personnel, adhering to contract schedule and cost contract, and attainment of subcontracting goals, if applicable. In accordance with FAR 15.305(a)(2), the currency and relevance of the information, source of the information, context of the data, and general trends in contractor's performance shall be considered. These are combined to establish one

performance confidence assessment rating for each offeror. In addition, this assessment of offeror's performance will contribute to the responsibility determination.

(capitalization and emphasis in original).[6] Regarding the Past Performance Factor, each proposal was to be evaluated under the following method:

| Adjectival Rating | Description |
| --- | --- |
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |

| | |
| --- | --- |
| Neutral Confidence | No recent/relevant performance record is available, or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned.<br><br>The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

---

[6] Additionally, the instructions to the offerors indicated:

The offeror shall submit a list of the last three contracts completed during the past three years or currently being performed that are similar to the solicitation size, scope, and complexity, and that are specifically related to property preservation and inspection services. Work that is of particular relevance to this solicitation and PWS includes, but is not limited to:

- Nationwide Property Inspections (REO and Foreclosure Custodial)
- Nationwide Property Preservation (REO and Foreclosure Custodial)

The USDA's evaluation of ISN's past performance in the Proposal Analysis Report states:

### 3.1.2 PAST PERFORMANCE FACTOR

#### 3.1.2.1 Performance Confidence Assessment - Observations and Conclusions

ISN is assigned as Substantial Confidence. Summarily, Offeror provided substantial past performance both for ISN and its major subcontractor [redacted]. The proposal indicated three contracts for past performance, two performed by the prime and one performed by major subcontractor [redacted]. There were no CPARs or PIPRs reported. The team received only one Past Performance Questionnaire for review. The questionnaire from HUD reflected a rating of "Five" (exceeds) in the areas of delivery performance and problem solving and a rating of "four" (meets and occasionally exceeds) in overall quality, quality of service, and quality of personnel (Ref. B20 Performance Evaluation Report).

(capitalization and emphasis in original). The Source Selection Decision Document concluded, regarding ISN's Past Performance:

ISN Past Performance Confidence rating of "Substantial" was reviewed and assessed on information reviewed by the TET on three contracts. Two of the contracts ISN was the Prime and with the third contract performed by their major proposed subcontractor, [redacted]. The ISN prime contract values ranged from $22M to 42M, which is comparable in size and scope to this solicitation requirement. There were no CPARs on record. A Past Performance Questionnaire from HUD was received reflecting "Five" (exceeds) in the areas of delivery performance and problem solving and a rating of "four" (meets and occasionally exceeds) in overall quality, quality of service, and quality of personnel.

As noted above, protestor MCS alleged that "[t]wo out of three of ISN's Past Performance examples did not meet the Solicitation's definition of how offerors would demonstrate relevance," and, therefore, the agency's Substantial Confidence rating for ISN's past performance was unreasonable.[7] MCS first cites to the Nationwide Asset Management Services for the United States Marshalls Service (USMS) contract.

---

[7] Regarding the third past performance contract submitted by ISN for the Past Performance Factor, the contract by subcontractor [redacted] Nationwide Asset Management Services for [redacted], MCS conceded that "[u]nder the terms of the Solicitation, the Agency properly considered" the contract to be relevant, but argued that "ISN only proposed that [redacted] perform 30% of the contract work." (internal references omitted). Additionally, MCS argued it "would be irrational for USDA to find that one out of three relevant contract examples entitled ISN to the highest Past Performance rating."

Regarding the USMS contract, ISN's proposal stated in part:

ISN supported the USMS by delivering an array of asset management services to a revolving portfolio of approximately [redacted] nationwide residential, commercial, and multi-family properties that were in the process of receiving Preliminary Order of Forfeiture (POF) or Final Order of Forfeiture (FOF) status to become REO in the DOJ AFF. ISN provided property maintenance and management services, routine inspections for condition assessment, vendor management, tenant rents and lease administration, data quality assurance, reporting, and much more.

**Property Management and Maintenance:** For this effort, ISN managed a wide range of properties, to include vacant and occupied residential and commercial buildings. ISN performed regular site visits to assess conditions, photograph property, and verify compliance with local code regulations. For properties with tenants, ISN performed lease and rent administration services, eviction proceedings, and the handling of delinquencies in rent. For properties without tenants, our management team worked with an expansive network of vendors to obtain bids and perform all recurring and emergency maintenance services.

**Staffing:** In order to properly staff the USMS contract, ISN utilized existing knowledgeable property management personnel, reallocated personnel, and hired approximately 8 additional staff members. Our teams of professionals worked hand and hand with USMS personnel daily to ensure the properties were properly preserved in order to fast track them for sale. We were able to use our nationwide, readily available field staff to provide personnel to support the management and maintenance of assets within the United States and all U.S. territories. Additionally, ISN demonstrated strong capability to minimize staff augmentation and other expense increases even as the scope of work was expanded throughout the course of the contract.

(capitalization and emphasis in original). Regarding the size of the USMS contract, which included a "revolving portfolio of approximately [redacted] nationwide residential, commercial, and multi-family properties," protestor noted that

[b]y contrast, USDA's portfolio consists of approximately [redacted] properties, a difference in magnitude of over [redacted]%. Similarly, the total contract price for ISN's USMS contract was $22.5M over six years, or approximately $3.75M per year. Even at ISN's unrealistically-low pricing [for the Solicitation at issue in the above captioned protest], the present procurement would be approximately [redacted]% greater in annual value than ISN's USMS contract.

(internal reference omitted).

46

The Source Selection Decision Document noted for ISN's three Past Performance references: "The ISN prime contract values ranged from $22M to 42M, which is comparable in size and scope to this solicitation requirement." The Source Selection Decision Document did not note, as protestor did, that the $22 million contract for USMS was a 6 year contract, and, therefore, did not explain how it would comparable in size and scope to this solicitation requirement." Similarly, the Proposal Analysis Report stated, in part: "ISN is assigned as Substantial Confidence. Summarily, Offeror provided substantial past performance both for ISN and its major subcontractor [redacted]. The proposal indicated three contracts for past performance, two performed by the prime and one performed by major subcontractor [redacted]. There were no CPARs or PIPRs reported. The team received only one Past Performance Questionnaire for review." The court notes that the Past Performance Questionnaire was not for the USMS contract, but for the United States Department of Housing and Urban Development contract discussed below. It is unclear how the Proposal Analysis Report could have determined that ISN could meet the requirements of the Solicitation based on the USMS contract, much less reach that conclusion with substantial confidence, which required that "the Government has a high expectation that the offeror will successfully perform the required effort."

Intervenor responded that the "USDA acted within its (considerable) discretion in evaluating this effort, and stated:

> Under this [USMS] contract, ISN delivered "an array of asset management services to a revolving portfolio of approximately [redacted] nationwide residential, commercia, and multi-family properties" that were in the process of becoming REO assets. AR 409. This included "property maintenance and management services, routine inspections for condition assessment, vendor management, tenant rents and lease administration, data quality assurance, reporting, and much more." *Id.* These services were performed "in all 50 U.S. States and its Territories," and specifically involved "performing weekly, biweekly, and monthly property inspections with photographs; . . . completing emergency repairs; . . . inspecting, reporting, and abating/remediating environmental hazards;" and more. AR 413. Moreover, as part of this effort, ISN "developed a network of approximately [redacted] geographically dispersed inspectors to deliver high quality, timely property inspections." *Id.* Considering the totality of this effort—and ISN's high performance marks under it (AR 413–14)—USDA considered this project as part of its *Substantial Confidence* past performance score.

(capitalization, emphasis and alterations in original). Intervenor, however, only quoted its own proposal, and aside from highlighting the deference owed the agency, does not attempt to explain how the agency determined the "Substantial Confidence" rating was warranted.

Defendant argued that

> MCS highlights the "difference" between the USMS contract and the USDA contract, by contraposing the quantity of properties serviced under each contract. MCS contends that, under the USMS contract, the portfolio is

> [redacted] properties whereas the current USDA contact requires service of [redacted] properties. Thus, MCS suggests that ISN did not fulfill the past performance requirement. MCS's argument has no merit.

(internal references omitted). Furthermore, defendant reasoned "the solicitation does not identify or define what constitutes 'similar in size, scope, and complexity,' and, thus, that determination is left to the broad discretion of the agency." Like intervenor, defendant does not rely on any documented rationale of the agency, or offer an explanation for why the difference in scope and price for the USMS contract would warrant a strong past performance evaluation. Defendant simply defaults to the deference to the agency argument. Although agency decisions are entitled to deference under APA review, see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 911 (citing E.W. Bliss Co. v. United States, 77 F.3d at 449), the deference is not absolute, and courts will reject an agency's determinations if they are unreasonable. See SP Sys., Inc. v. United States, 86 Fed. Cl. at 23. The court finds that with respect to the Past Performance evaluation for the USMS contract, the agency's determination was unreasonable. The agency provided no explanation for why the USMS contract met the past performance requirements, did not attempt to justify the difference in the size and scope of the contract, or explain why a past performance questionnaire was not obtained for the USMS reference. Given the difference, in the size and scope for the USMS contract versus the anticipated contract to be award under the Solicitation, it was incumbent on the agency to document some rationale for giving ISN the highest past performance rating.

As noted above, only MCS and ISN were given Technical Factor ratings of Outstanding and Past Performance ratings of Substantial Confidence. As the Solicitation explained in the "**Relative Importance of Factors:**"

> The award resulting from this solicitation will be made based on the best overall proposal that is determined to be the most beneficial to the Government (i.e., best value tradeoff process). The Technical Capability Factor is slightly more important than the Past Performance Factor. Technical Capability Subfactors, 1.1, 1.2, 1.3, 1.4 and 1.5, are rated in descending order of importance. Overall, Non-Price Factors, when combined, are significantly more important than Price. Price is not an adjectivally rated Factor; however, the Price Factor will become the more dominant factor as technical proposals reach technical equality.

Had ISN not received a Substantial Confidence rating like MCS, the agency may have determined MCS was entitled to contract award. Given the requirement, the paucity of information about the USMS contract in the agency's evaluations is glaring.

MCS also questions a second contract that ISN included for its past performance, Mortgagee Compliance Management for the United States Department of Housing and Urban Development (HUD). As indicated in the Administrative Record, as Mortgagee Compliance Manager

> ISN is responsible for assigned Mortgagee Compliance Manager functions including:
> - [redacted]

48

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

MCS notes that for Past Performance submissions, the Solicitation required "[r]elevant experience must be demonstrated within the last three years of providing property preservation and inspection services as required in the PWS." Protestor argued that "ISN provided financial and title-related services to HUD, while MCS and other field service organizations performed the property preservation work," and "[b]ecause ISN's HUD contract did not involve 'providing property preservation and inspection services' for any period of time, it is not relevant under the terms of the Solicitation."

Regarding the HUD contract, defendant argued: "[A]s noted by the agency, the HUD contract involved providing services in rural and remote areas (similar to USDA's contract), AR 1586, performance involved servicing [redacted] properties per year (exceeding USDA's contract), AR 1586, and performance involved pre and post foreclosure services (similar to USDA's contract), AR 1586." The court notes, however, all three of defendant's citations are to the exhibits at the GAO. Moreover, the exhibits defendant refers to are from the past performance evaluation of the HUD contract prior to the corrective action, and not to the one currently before the court. Similarly, intervenor, citing to its proposal in the Administrative Record, argued the HUD contract involved

"pre- and post-foreclosure services to approximately [redacted] properties per year," including "processing property preservation requests on behalf of HUD; reviewing property inspections conducted on defaulted single family (SF) FHA properties; submitting contingency preservation requests to the COR for emergency repairs or environmental hazard abatement; providing daily, weekly, and monthly reporting on property volume, revenue recovery/expenditures, and contract performance."

Additionally, intervenor argued that "though USDA recognized that this work did not involve actually performing the services, it did 'indicate[] experience with pre- and post-foreclosure services, and detailed support that [redacted]." The court notes, however, like with defendant's argument, the agency's past performance evaluation of the HUD contract is from the first evaluation, prior to the corrective action. It does not appear again in the agency's evaluation after the corrective action. Moreover, ISN left out an important part of the evaluation in its quotation. The sentence ISN quoted states in full: "The team noted that past performance record number two supporting HUD which indicated experience with pre- and post-foreclosure services, [redacted] as opposed to performing the services." (emphasis added) Moreover, the intervenor does not contradict protestor's claim that "ISN provided financial and title-related services to HUD, while MCS and other

49

field service organizations performed the property preservation work," and admits that the USDA "recognized that this work did not involve actually performing the services." ISN's work for the HUD contract appears to be substantially different than the work ISN would be expected to perform for the USDA, and raises questions as to why the HUD contract would warrant a past performance rating of Substantial Confidence from the agency's evaluation of ISN's proposal.

As noted above, regarding ISN's past performance, the agency in the Proposal Analysis Report indicated:

> ISN is assigned as Substantial Confidence. Summarily, Offeror provided substantial past performance both for ISN and its major subcontractor [redacted]. The proposal indicated three contracts for past performance, two performed by the prime and one performed by major subcontractor [redacted]. There were no CPARs or PIPRs reported. The team received only one Past Performance Questionnaire for review. The questionnaire from HUD reflected a rating of "Five" (exceeds) in the areas of delivery performance and problem solving and a rating of "four" (meets and occasionally exceeds) in overall quality, quality of service, and quality of personnel (Ref. B20 Performance Evaluation Report).

(capitalization and emphasis in original). The Source Selection Decision Document concluded, regarding ISN's Past Performance:

> ISN Past Performance Confidence rating of "Substantial" was reviewed and assessed on information reviewed by the TET on three contracts. Two of the contracts ISN was the Prime and with the third contract performed by their major proposed subcontractor, [redacted]. The ISN prime contract values ranged from $22M to 42M, which is comparable in size and scope to this solicitation requirement. There were no CPARs on record. A Past Performance Questionnaire from HUD was received reflecting "Five" (exceeds) in the areas of delivery performance and problem solving and a rating of "four" (meets and occasionally exceeds) in overall quality, quality of service, and quality of personnel.

(capitalization in original).[8] The agency provides no insight for why the HUD contract warranted the strong past performance reference. Moreover, the USDA did not explain

---

[8] The court notes, in the original evaluation by the agency before the corrective action, which the defendant and intervenor cite to, the USDA determined with regard to ISN's past performance:

> ISN provided past performance information on three contracts, two performed by the prime and one performed by major subcontractor [redacted]. The first record, performed by ISN, cited a contract value of approximately $22M and supported the USMS by delivering asset management services to a revolving portfolio of approximately [redacted]

why the HUD contract met the requirements of "[r]elevant experience must be demonstrated within the last three years of providing property preservation and inspection services as required in the PWS." The agency did not even describe if the HUD contract had involved performance of "preservation and inspection services." Instead, the agency simply stated that ISN's HUD contract had a strong reference with its Past Performance Questionnaire.

In its brief, protestor argued that "[t]his case is similar to FFL Pro LLC, 124 Fed. Cl. 536, 555 (2015), in which the Court set aside an agency's past performance evaluation," and the court agrees. In FFL Pro LLC v. United States, the United States Department of State's Office of Antiterrorism Assistance (ATA) issued a solicitation for the acquisition of overseas cyber security training services and supplies. See id. at 539. In FFL Pro LLC, a Judge of the United States Court of Federal Claims explained that "proposals would be evaluated according to five factors; in descending order of importance, these factors were: (1) Technical Compliance With all of the Terms and Conditions of the Solicitation ('Technical Compliance'); (2) Corporate Experience; (3) Past Performance; (4) Status of Property Management; and (5) Price." Id. at 540 (footnote omitted). Regarding Past Performance, the solicitation in In FFL Pro LLC stated that:

> Offerors are advised to use references from projects involving relevant IT supplies and IT training services within the scope of this solicitation and in compliance with [Federal Acquisition Regulation ("FAR") ] 52.212–1. (i) Provide a description of the offeror's experience in the professional information technology services and cyber training services industries referenced in the [request for proposals]. Describe three completed or on-going project(s), similar in size and complexity to the effort contemplated herein and in sufficient detail for the Government to perform an evaluation.

---

> nationwide residential, commercial, and multi-family properties (occupied and vacant). The second record, performed by ISN, cited an awarded value of $42M over the period 06/01/2015 to 5/31/2020 and supports the current Department of Housing and Urban Development (HUD) National Servicing Center's (NSC's) Mortgagee Compliance Manager (MCM). The third record, performed by [redacted], cited a contract value of $425M from 08/2009 to present. This effort provides nationwide Real Estate Owned (REO) asset management, title services, field services, valuations, brokerage, online marketing, and settlement services in support of [redacted]. The team noted that past performance record number two supporting HUD which indicated experience with pre- and post-foreclosure services, [redacted] as opposed to performing the services.

> There were no CPARs or PIPRs reported. The team received only one Past Performance Questionnaire for review. The questionnaire from HUD reflected a rating of "Five" (exceeds) in the areas of delivery performance and problem solving and a rating of "four" (meets and occasionally exceeds) in overall quality, quality of service, and quality of personnel.

FFL Pro LLC v. United States, 124 Fed. Cl. at 541 (brackets in original). Awardee VariQ Corporation (VariQ) was awarded an "Exceptional" past performance rating, and protestor FFL Pro LLC challenged the past performance rating, among other claims at the Court of Federal Claims. See id. at 546. The Judge in FFL Pro LLC recognized that the "evaluation and rating of proposals is within the discretion of the procuring agency," but in the FFL Pro LLC case,

> the Technical Evaluation Team's evaluation of VariQ's past performance—twice endorsed by the contracting officer—does not meet these standards because it does not address any of the criteria set forth in the Past Performance factor description; in other words, it does not evince a consideration of relevant factors. Indeed, the narrative summary provided by the Technical Evaluation Team in support of its exceptional rating is little more than a copy-and-paste of the solicitation's definition of "exceptional."

FFL Pro LLC v. United States, 124 Fed. Cl. 536, 555–56 (2015) (footnote omitted). Therefore, the Judge concluded "[i]n the absence of a coherent and reasonable explanation from the ATA of its evaluation of VariQ's proposal under the Past Performance factor, the court cannot ascertain whether the ATA's evaluation had a rational basis." Id. at 557 (footnote omitted). Similarly in the above captioned protest, the court cannot determine how the agency determined the HUD contract warranted a past performance rating of Substantial Confidence, or how the agency even determined that the work performed by ISN was in line with the requirements for performance of the contract to be award by the USDA. Despite the great deference afforded the agency for its past performance evaluations, see Todd Constr., L.P. v. United States, 88 Fed. Cl. 247; Vanguard Recovery Assistance v. United States, 101 Fed. Cl. at 785, given the USDA's minimal explanation of how the agency evaluated ISN's HUD past performance, the court finds the agency's conclusion was not reasonable.

Having found that the USDA's evaluations of two of ISN's three past performance references were not reasonable, and not performed in accordance within the requirements of the Solicitation, the agency's decision to award ISN a past performance rating of Substantial Confidence rating, the highest possible rating and the rating which requires the agency to determine that based on the relevant performance record, "the Government has a high expectation that the offeror will successfully perform the required effort," the agency acted unreasonably, see Torres Advanced Enter. Sols., LLC v. United States, 133 Fed. Cl. at 531, and the agency's past performance evaluation of ISN, therefore, was arbitrary and capricious.

The court notes that the GAO reached the opposite conclusion about the USDA's past performance evaluation. As noted above, the GAO determined:

> While the protester notes aspects of two of ISN's contracts that were dissimilar to the instant effort, the evaluation record demonstrates that ISN's overall past performance and experience supports the agency's assigned ratings. In this respect, ISN submitted two contract references involving

property management services, including a contract performed by ISN's subcontractor with a value of $425 million. The third contract, the HUD contract, involved the provision of portfolio management services for approximately 60,000 properties per year. While such services were merely "related to" property preservation and inspection services, we find that the agency nonetheless acted reasonably in considering the HUD contract as part of ISN's overall past performance and relevant experience. In sum, we find that the agency reasonably found that ISN's overall experience and past performance were relevant and merited the high ratings assigned to ISN under those factors.

Id. at *8 (internal references omitted). With respect to the GAO,[9] the GAO's conclusions regarding ISN's past performance appear summary, and did not fully address the differences in the size and scope of ISN's past performance references. Most notably, with regard to the HUD contract, the GAO indicated the services performed were "merely 'related to' property preservation and inspection services," the GAO found "that the agency nonetheless acted reasonably in considering the HUD contract as part of ISN's overall past performance and relevant experience." Id. As the solicitation at issue was for property preservation and inspection services for USDA's rural property portfolio the GAO's decision does not reflect sufficient analysis of the reasonableness by the agency to find the HUD contract warranted a Past Performance rating of "Substantial Confidence."

As the USDA's evaluations of two of ISN's past performance references were not reasonable, this calls into question the agency's evaluation of the Technical Factor's first sub-factor. As noted above, for the Technical Factor, the Solicitation stated:

**FACTOR 1 – Technical Capability** – Overall the Technical Capability will be evaluated based on the extent to which it is demonstrated a likelihood of successful performance of the requirements of the Performance Work Statement (PWS) (Attachment A). The effectiveness and feasibility of the proposed Technical Capability and the offerors understanding of the work will be considered as part of the assessing the likelihood of successful performance.

(capitalization and emphasis in original). The Solicitation explained that

[t]here are five technical capability subfactors that will be evaluated and considered in descending order of importance as follows and evaluated based on:

---

[9] Although Judges of the United States Court of Federal Claims, including the undersigned, have high respect for the expertise of the GAO, and often consider the reasoning included in GAO decisions when reaching their own opinions, GAO decisions are not binding on the United States Court of Federal Claims. See Cleveland Assets, LLC v. United States, 132 Fed. Cl. 264, 280 n.15 (2017); see also Centech Grp., Inc. v. United States, 554 F.3d at 1038.

> **Sub-factor 1.1** - **Relevant Experience -** Demonstration of experience in providing services to assist USDA, RD in providing a variety of property/asset management services associated with pre and post liquidation of SFH rural properties serving as security for rural housing loans and guarantees of equivalent portfolio size, as specifically listed in the PWS.

(capitalization and emphasis in original). Therefore, the Technical Factor's first sub-factor was considered the most important technical sub-factor. The requirement required the "[d]emonstration of experience in providing services to assist USDA," however, as determined above, the experience provided by ISN in its proposal was not sufficient to demonstrate ISN had performed similar work to the work required by the agency for successful performance of the contract. The agency should have more carefully considered whether ISN's insufficient past performance references warranted an overall Technical rating of Outstanding, which requires that the "[p]roposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low."

Price

Additionally, protestor alleged that the "USDA failed to properly evaluate ISN's unrealistically low pricing," and claimed that the "Agency performed an irrational price realism evaluation of ISN." In response, defendant argued that the "USDA's price realism analysis was reasonable and in accordance with the Solicitation." Similarly, ISN claimed the "USDA's thorough price realism evaluation should be upheld."

A price realism analysis considers whether an offeror's price is too low, such that it indicates a risk of poor performance and a lack of understanding of the solicitation requirements. See KWR Constr., Inc. v. United States, 124 Fed. Cl. 345, 356 (2015) ("Generally, a price realism analysis examines the performance risk of proposals in a fixed-price contract procurement, with particular attention to the risk of low-priced proposals. . . .") (internal citations removed). A price realism analysis differs from a price reasonableness analysis because a price reasonableness analysis considers whether an offeror's price is too high.[10] See Munilla Constr. Mgmt., LLC v. United States, 130 Fed. Cl. 635, 649 (2017) (explaining that an agency's concern in making a price reasonableness determination is whether the prices are too high, and a "determination of whether an offeror's prices are too low is made when an agency conducts a cost or price realism analysis"); see also EMTA Isaat, A.S. v. United States, 123 Fed. Cl. 330, 338 n.9 (2015) ("In general, a price reasonableness analysis has the goal of preventing the government from paying too much for contract work. A price realism analysis, on the other hand, investigates whether the contractor is proposing a price so low that performance of the contract will be threatened."). Price realism is not defined in the Federal Acquisition

---

[10] FAR 15.404-1(a) requires a price reasonableness evaluation and provides that the "contracting officer is responsible for evaluating the reasonableness of the offered prices" in a negotiated procurement. 48 C.F.R. § 15.404-1(a)(1) (2019). The parties do not dispute that the agency considered price reasonableness.

Regulation (FAR). See Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 541 n.36 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. at 663 n.11 (quoting Ralph C. Nash & John Cibinic, Price Realism Analysis: A Tricky Issue, 12 No. 7 Nash & Cibinic Rep. ¶ 40 (July 1988) (citing 48 C.F.R. § 15.404–1(d)(1), (3)) ("A price realism analysis 'is analysis to determine if the offeror's proposed prices are unrealistically low.'").[11]

The Federal Circuit has explained that Judges of this court should determine "whether the agency's price-realism analysis was consistent with the evaluation criteria set forth in the RFP, see Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004), not to introduce new requirements outside the scope of the RFP." See Alabama Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d at 1375–76 (emphasis in original). The Federal Circuit in Agile Defense, Inc. v. United States, also indicated, albeit with regard to cost realism:

> The regular view of the Court of Federal Claims, which we approve, is that contracting agencies enjoy wide latitude in conducting the cost realism analysis. See, e.g., Mission1st Grp., Inc. v. United States, 144 Fed. Cl. 200, 211 (2019) ("It is well established that contracting agencies have broad discretion regarding the nature and extent of a cost realism analysis, unless the agency commits itself to a particular methodology in a solicitation." (citation and internal quotation marks omitted)); Dellew Corp. v. United States, 128 Fed. Cl. 187, 194 (2016) ("The Agency has demonstrated that it considered the information available and did not make irrational assumptions or critical miscalculations. To require more would be infringing on the Agency's discretion in analyzing proposals for cost realism." (citation and internal quotation marks omitted)); United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 329 (2003) (emphasizing that the procuring "agency is in the best position to make [the] cost realism determination" (citation and internal quotation marks omitted)).

Agile Def., Inc. v. United States, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020); see also Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 358 (2009) ("The nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation.").

Judges of this court have found that, in a fixed-price procurement, an agency is required to perform a price realism analysis when the solicitation expressly provides that

---

[11] Unlike price realism, FAR 15.404-1(d) defines a cost realism analysis as "the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." 48 C.F.R. § 15.404-1(d)(1).

the agency will evaluate price realism or states that "[t]he Government may reject any proposal that is . . . unreasonably high or low in price when compared to Government estimates, such that the proposal is deemed to reflect an inherent lack of competence of [sic] failure to comprehend the complexity and risks of the program." VION Corp. v. United States, 122 Fed. Cl. 559, 573 (2015) (emphasis removed) (finding that such language commits the agency to conducting a price realism analysis); see also EMTA Isaat, A.S. v. United States, 123 Fed. Cl. at 338 (explaining that there "is no dispute that the plain language of the RFP required the government to conduct a price realism analysis" when the solicitation provided that "[a]ll offerors['] proposed prices will be evaluated to ensure they are realistic, reasonable, and complete"); D & S Consultants, Inc. v. United States, 101 Fed. Cl. at 33 (explaining that the parties agreed that the solicitation required a price realism analysis because it stated "[t]he Government may evaluate the offeror's proposed labor rates to determine if the proposed rates are unrealistically low in order to assess the ability of the offeror to meet the PWS requirements and whether the proposal provides the Government with a high level of confidence of successful performance"). In Afghan American Army Services Corp. v. United States, another Judge on this court determined that an agency was required to conduct a price realism evaluation because the solicitation stated that the agency would "evaluate price proposals to determine whether the offered price reflects a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach" and that proposals with "an unreasonable (high or low) price may be deemed to be unacceptable and may not receive further consideration." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 357 Similarly, in Rotech Healthcare, Inc. v. United States, the court concluded that a price realism analysis was required because the solicitation stated that an "unrealistically low price may be grounds for eliminating a proposal." Rotech Healthcare, Inc. v. United States, 121 Fed. Cl. 387, 404 (2015) (explaining that "the only reason any consideration of realism is necessary is the language in the RFP stating that unrealistically low offers may be eliminated").

Regarding price, the Solicitation stated:

Price analysis is a process of examining and analyzing a proposed price without evaluating separate cost elements and proposed profit/fee to ensure that the proposed price is fair and reasonable. The CO may use the following techniques in performing price analysis:

(a) Comparison of proposed prices received in response to the Solicitation;
(b) Comparison of previously proposed prices and contract prices with current proposed prices for the same or similar services (labor categories) in comparable quantities; and,
(c) Comparison of proposed prices with independent cost estimates.

Specifically regarding a price realism analysis, the Solicitation indicated:

The purpose of realism analysis is to ensure that proposed prices are not so low such that contract performance is put at risk from either a technical and/or cost perspective. It is separate from analyses performed to determine price reasonableness. Realism analysis determines whether an offeror's proposed costs and/or prices:

(a) Are realistic for the work to be performed;
(b) Reflect a clear understanding of the requirements; and
(c) Are consistent with the various elements of the offeror's technical proposal.

Price Realism analysis is an objective process that focuses on the proposed price and performance risks. Price realism is used when requirements may not be fully understood by the offeror, there are quality concerns, past experience indicates that contractors' proposed prices have resulted in quality of service shortfalls. Results of the analysis may be used in performance risk assessments and responsibility determinations.

The Solicitation, therefore, required a price realism analysis, but did not specify how the agency was to evaluate price realism, or mandate any specific approach.

Regarding ISN's price proposal, the Proposal Analysis Report included the following chart and discussion:

### COMPETITIVE PRICE CHART

| | ISN | [redacted] | [redacted] | [redacted] | MCS | [redacted] | [redacted] |
|---|---|---|---|---|---|---|---|
| CLIN 001 TOTAL IDIQ 18 | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| CLIN 001 TOTAL TASK ORDER | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| | | | | | | | |
| CLIN 002 TOTAL IDIQ 18 | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| CLIN 002 TOTAL TASK ORDER | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| | | | | | | | |
| BOTH CLINS TOTAL IDIQ 18 | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |
| BOTH CLINS TOTAL TASK ORDER 12 MONTH | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] | $[redacted] |

CLIN 001 Inspections - Pricing is below the CPR, and comparable to CLIN 001 pricing for MCS, [redacted] and [redacted]. Therefore CLIN 001 is found fair and reasonable.

CLIN 002 Property Preservation Services - The individual service items on the price list are lower than the CPR and is competitive with prices received as shown in the chart above. The Offeror indicated in their Vol 3 Price Proposal, that their pricing was "well researched, and was 100 percent compliant, based on existing rates, other Government work similar in nature, numerous independent surveys and market data which lower staffing in their approach." Further justification for pricing is that the offeror indicated through a clarification that they are aware this requirement is for rural America and that their pricing reflects that fact. Therefore, their price is found realistic and in conformity with their proposed technical approach.

The offerors combined CLIN 001 and 002 price is competitive with other offered prices, and in accordance with evaluation criteria set forth in section M paragraph 4., "the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal."

ISN tied MCS in their technical rating with an "outstanding" but had an overall lower price. ISN is found to be fair and reasonable and has been determined to be the best value with an outstanding technical rating and lowest price out of the two offerors whom received an outstanding rating*Competition Price Results (Ref. B19 Price Proposal Evaluation-Price Competition Memo).

(capitalization and emphasis in original). With regard to ISN's pricing, the agency's Price Competition Memo stated:

CLIN 001 Inspections - Pricing is in line with the CPR, and comparable to CLIN 001 pricing for MCS, [redacted] and [redacted]. Therefore CLIN 001 is found fair and reasonable.

CLIN 002 Property Preservation Services - The individual service items on the price list are lower than the CPR, however, are competitive with prices received as shown in the chart above. The Offeror indicated in their Vol 3 Price Proposal, that their pricing was "well researched, and was 100 percent compliant, based on existing rates, other Government work similar in nature, numerous independent surveys and market data which lower staffing in their approach." Further justification for pricing is that the offeror indicated through a clarification that they are aware this requirement is for rural America and that their pricing reflects that fact.

The offerors combined CLIN 001 and 002 price is competitive with other offered prices, and in accordance with evaluation criteria set forth in section M paragraph 4., "the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal."

ISN tied MCS in their technical rating with an "outstanding" but had an overall lower price. ISN pricing at $[redacted] for Task Order 1; and, IDIQ 18-month ceiling of $$34,983,380.00 is found to be fair and reasonable. Their pricing is also determined to be realistic in accordance with their technical approach and understanding of the work, as demonstrated in their "outstanding" technically rated proposal and through clarification, as stated above.

(capitalization in original). Regarding ISN's price, the Source Selection Decision Document stated:

> Overall pricing for the Task Order 1 of $[redacted], is aligned with the CPR, and other comparatively priced offerors submitted in response to this solicitation requirement. Further, pricing for some of the individual service items appear to be aligned with the corrective action Attachment 2, Unit Price Analysis, which was an average of other agency's public price lists. Therefore, their pricing was deemed fair, reasonable, realistic and balanced for the work under this requirement with the unique feature different from other property preservation contracts in that in the commercial market this work is most often in rural areas that are oftentimes difficult to reach.

The justification for the price realism analysis came from the conclusion, referred to in both the Proposal Analysis Report and the Price Competition Memo, that ISN's prices were "lower than the CPR," competitive with other offerors, and ISN "indicated in their Vol 3 Price Proposal, that their pricing was 'well researched, and was 100 percent compliant, based on existing rates, other Government work similar in nature, numerous independent surveys and market data which lower staffing in their approach.'"

Protestor argued that the "USDA's quantitative 'analysis' in support of these conclusions consisted of a few spreadsheets with columns simply listing side-by-side the pricing values for each offeror, the IGCE [Independent Government Cost Estimate], the CPR, and the AAP." (brackets added). ISN argued, however, that the "USDA's thorough price realism evaluation should be upheld," and defendant takes issue with MCS' characterization of the agency's analysis, noting that "MCS states that the agency's entire determination was limited to a single 'conclusory statement' supported by an excel spreadsheet." According to ISN, "MCS's argument is factually incorrect and legally unsound," arguing that "the agency's assessment of ISN's price was comprehensive. The technical evaluation team, pricing evaluation team, contracting officer, and Source Selection Authority reviewed and assessed ISN's pricing proposal." (internal references omitted). Defendant also claims that protestor's

> argument that each progressive level of review merely "parroted" the prior review, is wrong. Each level of review culminated in a narrative analysis that recited the record evidence demonstrating that ISN's pricing proposal was realistic. That the evidence did not change over the course of the pricing realism analysis and that the multiple assessors found the same evidence persuasive does not reflect an insufficient assessment; the agreement amongst the assessors bolsters, rather than detracts from, the determination that ISN's prices were realistic.

(internal references omitted). Defendant's arguments notwithstanding, the court is not clear why the agency believed ISN's prices to have been realistic. The agency's clearest statement on ISN's price is:

> CLIN 001 Inspections - Pricing is in line with the CPR, and comparable to CLIN 001 pricing for MCS, [redacted] and [redacted]. Therefore CLIN 001 is found fair and reasonable.
>
> CLIN 002 Property Preservation Services - The individual service items on the price list are lower than the CPR, however, are competitive with prices received as shown in the chart above. The Offeror indicated in their Vol 3 Price Proposal, that their pricing was "well researched, and was 100 percent compliant, based on existing rates, other Government work similar in nature, numerous independent surveys and market data which lower staffing in their approach." Further justification for pricing is that the offeror indicated through a clarification that they are aware this requirement is for rural America and that their pricing reflects that fact.

(capitalization in original). The agency's simple statement that the prices are in line with the CPR alone does not merit a finding that the price realism analysis is sufficient. Although the evaluations included various charts, the charts are not given any context by the agency. Likewise, the agency's reliance on ISN's own statement that their pricing was "well researched, and was 100 percent compliant, based on existing rates, other Government work similar in nature, numerous independent surveys and market data which lower staffing in their approach," does not alone merit a determination that the agency performed an adequate price realism analysis. Similarly, insufficient is the intervenor's acknowledgment that ISN is "aware this requirement is for rural America and that their pricing reflects that fact" cannot alone demonstrate that ISN's prices were realistic. In sum, the agency's own evaluations do not reflect why the USDA found ISN's prices were realistic.

> Protestor also claimed that
>
> ISN's combined CLIN 001 and 002 price for Task Order 1 was lower than the IGCE by over [redacted] percent, lower than the CPR by over [redacted] percent, lower than the next highest offeror by over [redacted] percent, *and lower than the Agency's own revised AAP by over* [redacted] *percent*. Any meaningful analysis – regardless of the method used – would have flagged ISN's proposal as being unrealistically low, or at the very least prompted further inquiry and evaluation of potential risks.

(capitalization and emphasis in original). Protestor also argued that "the lowest of the technically acceptable and reasonably priced offers (i.e., those included in the CPR) also belonged to the awardee, but ISN's IDIQ and Task Order ceiling bids were *nearly* [redacted] *percent below* the highest price proposal in the CPR." (capitalization and emphasis in original). ISN somewhat confusingly responded that "the evaluation confirmed that a low price was not, in and of itself, a basis to not award a contract to an offeror; indeed, the Solicitation *encouraged* low pricing, noting that 'where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal." (emphasis in original). Furthermore, intervenor argued that "[t]his

cherry-picked data point [that ISN's ceiling bids were nearly [redacted]% below the highest price proposal] does not, however, show that ISN's price was unrealistically low."

The pricing analysis by the agency consisted of the CPR, which "established average prices for CLINs 001 and 002, both for an 18-month and 12-month (task order) period, using only the proposals rated Acceptable and better,"[12] and the Averaged Agency Pricing (AAP). The agency explained that, after the corrective action:

> A comparison price chart was created in order to compare the pricing of individual service items against the Offeror's price proposals. Also, for this corrective action, we had the RD Price Estimator, put together an estimate of pricing for individual service line items. The estimate was based on pricing from publicly available price lists of other agencies with similar requirement, namely, HUD, VA, Fannie Mae, and Freddie Mac, hereafter, "Averaged Agency Pricing" (AAP). Under the AAP, Attachment 2, the IDIQ ceiling price is $33,717,020.00 (CPR $43,242,629.00) and the Task Order 1 ceiling is $23,530,544.00 (CPR $28,794,738.00).

The agency concluded: "Therefore, what is demonstrated that [sic] even though certain services items are comparable to the pricing submitted by a number of the Offerors, predominately, the AAP's service item prices are lower than the comparative CPR service item prices. Note, however, this information is for reference only and is not incorporated in the writeup for this report." This statement, "this information is for reference only and is not incorporated in the writeup for this report," is unclear as to its meaning or its use in the evaluations. Unstated in the above, or in the evaluation documents, was why the agency determined there was a need to create another price comparison tool, why there was a difference between the two benchmarks of the CPR and the AAP, where the difference came from, and why the differences were significant. Based on the information in the Administrative Record, the CPR for the Task Order 1 ceiling was $28,794,738.00, and the AAP for the Task Order 1 ceiling was $23,530,544.00, a difference of $5,264,194.00. For the ceiling for the entire requirement, the CPR was calculated at $43,242,629.00, and the AAP was calculated at $33,717,020.00, a difference of $9,525,609.00. Despite the large disparity between the CPR and the AAP, the agency did not explain which was a better assessment of the offeror's prices, and why either the CPR or the AAP would better evaluate if the offeror's prices were realistic. Although intervenor stated "[t]he AAP was well researched, AR 917–943, and, moreover, helped to confirm the agency's analysis. AR 921. USDA's consideration of this information was

---

[12] The agency's evaluation documents further refer to the IGCE, but without any explanation or context for how the price proposals relate to IGCE. The Administrative Record included internal USDA emails which indicated that IGCE was "based on avg. cost(s) from HUD, VA, Fannie Mae and Freddie Mac," but neither the emails nor the agency's evaluation documents explained if the IGCE was used as a metric for price realism.

appropriate," the Administrative Record at those citations do not support ISN's arguments.[13] Furthermore, as protestor argued,

> it is unclear from what specific sources the Agency gathered the data included in the AAP backup or if USDA took any steps to verify their reliability and currency. The Agency cost estimator merely asserted without further explanation that the AAP "is based on [average] cost(s) from HUD, VA, Fannie Mae and Freddie Mac," and the Contracting Officer stated *post-hoc* that "[t]he pricing Estimator found the agencies price lists on their respective websites and through Google searches." But the record is silent, for example, as to the effectivity or validity dates of the pricing obtained.

(internal reference omitted). Moreover, because the agency did not articulate whether the AAP evaluated prices or the CPR evaluated prices were more realistic for the services in the Solicitation, or if the same benchmarks should be applied to both the first task order and the entire contract, the court remains uncertain how the agency determined whether ISN's pricing, which was similar to the AAP and lower than the CPR was realistic, or the methodology used by the USDA to reach that conclusion.

Both defendant and intervenor accuse protestor of asking the court to conduct its own price realism analysis, as intervenor states, "MCS asks the Court to conduct its own price realism evaluation (or, better yet, to simply latch onto MCS's analysis)," (footnote omitted), and defendant states that "MCS's invitation to the Court to rewrite the solicitation and require USDA to assess the range that the proposals fall within, and provide certain calculations, analyses, or assessments, is inappropriate and far beyond the scope of judicial review." (internal references omitted). Further both defendant and intervenor argue that "the unstated premise of MCS's argument is that it wished USDA had utilized a different methodology to assess pricing realism." As noted above, "the nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's discretion, unless the agency commits itself to a particular methodology in a solicitation." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 358. Additionally, the Judge in Afghan American Army explained, "[t]he agency's 'discretion is even more pronounced when the Solicitation is silent regarding the methodology to be used in conducting a "price realism analysis,"'" as was the case with the Solicitation in the above captioned protest. Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 358 (quoting Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 101 (2006), recons. in part, 75 Fed. Cl. 406 (2007)). The court also is cognizant of the Supreme Court's instruction that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n v. State

---

[13] The Administrative Record at the citations offered by intervenor does not demonstrate the AAP was well researched, as the pages include how the IGCE was established, and included a document titled: "This page provides examples of key activities, this DOES NOT provide any approval to do work. But if work is approved this is what we mean," and included examples of "**Clean Toilet**," "**Dryer Vent Cover**," "**Fungicidal Protective Coating**," and "**Roof Components**." (capitalization and emphasis in original).

Farm Mut. Auto. Ins. Co., 463 U.S. at 43. The court does not seek to substitute its judgment for the agency. The court, however, already found the agency was arbitrary and capricious with regard to the past performance evaluation of ISN. Regarding price, the agency has failed to explain why it found ISN's price was realistic, why it chose the various metrics to evaluate price realism, and which metric the agency applied to determine price realism. Despite the documentation provided by the agency quoted above, there remains insufficient explanation of why the agency found ISN's price realistic for the requirements of the Solicitation.

The court notes that although, the GAO found the USDA's price realism analysis was reasonable, the GAO did not attempt to determine why the agency used both the CPR and the AAP, and just concluded: "[W]e find that the agency's use of a second benchmark (the AAP) was a reasonable further step to consider and compare the pricing received to the pricing received by other agencies for similar services, and find no support for the protester's assertion that this extra step was arbitrary or unnecessary." Mortg. Contracting Servs., LLC, B-418483.2, B-418483.3, 2020 WL 6625956, at *10 (capitalization and brackets in original) (internal references omitted). The court believes the GAO did not critically examine why the agency used two different benchmarks or why the benchmarks produced differing results, and if that would have raised questions about the agency's price realism analysis.

Additional Claim

In its amended complaint, protestor raised another claim, that the USDA irrationally failed to assign a deficiency to ISN's proposal, MCS alleged the "Solicitation included a clear requirement that PWS Tasks 1-6 be performed in accordance with the following AQL: '95% of tasks will be completed within 10 days. The remaining 5% will be completed within 21 days unless there is an exception granted by the Government,'" and argued that "ISN did not meet the AQL requirement to perform 95% of each of PWS Tasks 1-6 within 10 days. Instead, for each of those Tasks, ISN proposed to perform 95% of the work within 14 days," and the "USDA should have assigned ISN a Deficiency in accordance with the Solicitation's stated evaluation criteria."[14]

The Solicitation required that PWS Tasks 1-6 be performed in accordance with the following AQL: "95% of tasks will be completed within 10 days. The remaining 5% will be completed within 21 days unless there is an exception granted by the Government." evaluation of an offeror's proposal for Tasks 1-6 would occur pursuant to Technical Factor 1, Subfactor 3, "Management Approach," which the Solicitation stated would be evaluated and rated according to the following criteria:

> Demonstration that the offeror can provide all management, supervision, labor, tools, supplies, insurance, taxes, fees, permits to complete the services, including all reporting and documentation as explicitly set forth in the PWS. A demonstration of how offeror will manage RD's large nationwide portfolio an and all quality assurance implementation. A QASP must be submitted with this plan (see QASP Template Attachment C2).

---

[14] This additional claim was not raised at the GAO.

Intervenor argued that as submitted, "[a]lthough ISN's proposal mistakenly referenced a 14-day completion timeline for these tasks, this did not make ISN's proposal noncompliant." Citing IBM Corp. v. United States 119 Fed. Cl. 145, 157 (2014), intervenor argued that the "[p]rinciples of interpretation suggest that the Court should read the proposal as a whole in order to discern the meaning of any individual parts." Additionally, ISN asserted:

> USDA gave wholistic effect to ISN's proposal by assuming (as was true) that the reference to 14 days for these Tasks was inadvertent and that ISN intended to perform these tasks within 10 days — as the totality of its proposal indisputably guaranteed. This conclusion was more than reasonable because ISN's proposal overwhelmingly affirmed that it would provide timely compliance for Tasks 1 through 6.

The court notes that although Tasks 1-6 require "95% of tasks will be completed within 10 days. The remaining 5% will be completed within 21 days unless there is an exception granted by the Government," a number of the other Tasks in the Performance Work Statement do allow for the offeror to complete 95% of the work within 14 days, as offered by ISN's proposal. For example, Task 7 - Automobile Removal requires "95% of tasks will be completed within 14 days; remaining 5% will be completed within 21 days unless an exception is granted by RD," and likewise, Task 10 - Code Violations requires "95% of tasks will be completed within 14 days; remaining 5% will be completed within 21 days unless an exception is granted by RD." By specifying that Tasks 1-6 require "95% of tasks will be completed within 10 days," compared to the 14 days for other tasks in PWS, the agency intentionally was seeking to have the overwhelming majority of Tasks 1-6 completed in the 10 day timeframe. Despite this, in its evaluation of ISN's Technical proposal, the agency overlooked, or ignored, the mistake in ISN's proposal and, nonetheless, awarded ISN an "Outstanding" rating for Technical Factor 1, Subfactor 3. It is not clear to the court if the agency overlooked or ignored the inconsistency as the agency did not document or explain its decision. Included in ISN's proposal was a "Proposed Quality Assurance Surveillance Plan," which indicated that "[u]pon receipt of task orders from USDA RD, [redacted]. Expected completion dates will be based on USDA RD requirements," and unlike the portion of the Technical proposal which indicated that 95% of Tasks 1-6 would be completed within 14 days, the Proposed Quality Assurance Surveillance Plan reflected that for Tasks 1-6, "95% of tasks will be completed within 10 days." The agency did not emphasize that the Proposed Quality Assurance Surveillance Plan indicated the correct timeframe, or contrasted the Proposed Quality Assurance Surveillance Plan with the rest of ISN's Technical proposal. Nor is there any explanation that the agency assumed, as ISN argued, "that the reference to 14 days for these Tasks was inadvertent."

Defendant contends that

> the narrative that indicates a 14-day timeframe was part of ISN's Management Approach. The evaluation criteria for Management Approach do not specifically require the agency to evaluate whether Tasks 1-6 would be completed within the timeframe set forth in the Performance

Requirement Summary. Therefore, the agency's evaluation of ISN's Management Approach narrative did not entail an assessment of ISN's ability to timely complete Tasks 1-6, and, therefore, ISN's reference to 14 days (rather than 10 days) had no effect on ISN's Management Approach rating.

(capitalization and emphasis in original). The government appears to be suggesting that, although the ten day requirement was part of the Solicitation and the Performance Work Statement requirements, because the agency's evaluation "did not entail an assessment of ISN's ability to timely complete Tasks 1-6, and, therefore, ISN's reference to 14 days (rather than 10 days) had no effect on ISN's Management Approach rating." ISN's failure meet the requirement, however, renders ISN's proposal non-responsive to the Solicitation.

The Federal Circuit has stated that "'a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'" Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1329 (quoting E.W. Bliss Co. v. United States, 77 F.3d at 448); see also Centech Grp., Inc. v. United States, 554 F.3d 1029, 1039 (Fed. Cir. 2009) (holding that a proposal that did not offer to provide what the request for proposals requests was not responsive to the request for proposals); Gen. Dynamics Mission Sys., Inc. v. United States, 137 Fed. Cl. 493, 521-22 (2018); Prescient, Inc. v. United States, 125 Fed. Cl. 475, 491 (2016). In Centech, the Federal Circuit further explained, "[t]o be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." Centech Grp., Inc. v. United States, 554 F.3d at 1037. "'A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the [proposal].'" Transatlantic Lines, LLC v. United States, 122 Fed. Cl. 624, 632 (2015) (quoting Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 505 (2009)) (brackets in original).

ISN's proposal on its face did not "represent an offer to provide the exact thing called for in the request for proposals," by proposing to complete 95% of Tasks 1-6 of the PWS in 14 days rather than the 10 days required in the Solicitation. ISN's after the fact representation that it was inadvertent and it that "ISN intended to perform these tasks within 10 days," cannot not change the terms of its proposal. Despite defendant's argument, the Federal Circuit's guidance regarding non-compliant proposals is not limited by an agency's choice for how consider the non-complaint submission in an agency's evaluation of proposals. Consistency and proper responses to the Solicitation regarding timely performance of individual task in the statement of work are important elements of responsiveness and meeting the stated requirements of the Solicitation. Therefore, if the failure to correctly and consistently meet the timing requirements of the Tasks in the Performance Work Statement rendered ISN's proposal noncompliant, the defendant's and intervenor's arguments are without merit.

Standing and Prejudice

As noted above, the court has determined that the USDA was arbitrary and capricious in its evaluation of ISN's proposal, and the court must also determine if MCS was prejudiced by the agency's actions. Intervenor ISN argued that "MCS is not in line for an award, so its protest should be dismissed," and contends that "[t]he Administrative Record confirms that MCS is not in line for the award due to its unreasonably high price. Therefore, MCS's protest should be dismissed (and its request for injunctive relief denied as moot)." Similarly, defendant argued that "MCS lacks standing to challenge the award to ISN. The agency determined that MCS's price was too high to receive an award." More specifically, defendant cited the USDA's determination that "MCS's 'pricing is unreasonably high based on the comparative analysis performed for this solicitation,'" and argued "MCS's unrealistically high price 'precludes them from being in line for the award,'" and concludes that "the Court should dismiss this protest for lack of standing." In response, protestor states that the "USDA expressly determined MCS' pricing to be fair and reasonable, and MCS was the second offeror in line for award after ISN. Accordingly, MCS is an interested party with standing in this case."

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Hymas v. United States, 810 F.3d 1312, 1317 (Fed. Cir. 2016) (explaining that a federal court must satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter

jurisdiction is an inquiry that this court must raise *sua sponte*, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006).

This court has jurisdiction to hear bid protests pursuant to 28 U.S.C. § 1491(b)(1) (2018) of the Tucker Act, which provides that this court has

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1); see also Weeks Marine, Inc. v. United States, 575 F.3d at 1359 (Fed. Cir. 2009). The Administrative Dispute Resolution Act of 1996, codified at 28 U.S.C. § 1491(b)(1)–(4), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1330–32.

The Tucker Act grants the United States Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(a)(1). In order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract).'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009)); see also Eskridge & Assocs. v. United States, 955 F.3d 1339, 1345 (Fed. Cir. 2020) ("In a post-award bid protest, the relevant inquiry is whether the bidder had a 'substantial chance' of winning the award—specifically, whether a protestor 'establish[ed] not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error.'" (quoting Statistica, Inc. v. Christopher, 102 F.3d at 1582)) (alteration in original); Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1317; AECOM Mgmt. Servs., Inc. v. United States, 147 Fed. Cl. 285, 290 (2020); Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 693 ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006); Statistica, Inc. v. Christopher, 102 F.3d at 1580–81;

Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980))). In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires "allegational prejudice," as contrasted to prejudice on the merits . . . ."); Bannum, Inc. v. United States, 115 Fed. Cl. 148, 153 (2014); see also Bannum, Inc. v. United States, 404 F.3d at 1358; Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1331; Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Corus Grp. PLC. v. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

In a post-award bid protest, such as the above-captioned bid protest, the "protestor must 'establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.'" Mgmt. & Training Corp. v. United States, 137 Fed. Cl. 780, 783-84 (2018) (quoting Rex Serv. Corp. v. United States, 448 F.3d at 1307); see also Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) ("An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract. Thus, a party must show that it is 1) an actual or prospective bidder and 2) that it has a direct economic interest."); Glocoms, Inc. v. United States, 150 Fed. Cl. 258, 264 (2020); AECOM Mgmt. Servs., Inc. v. United States, 147 Fed. Cl. at 290; PAE-Parsons Global Logistics Servs,. LLC v. United States, 145 Fed. Cl. 194, 198 (2019); Timberline Helicopters, Inc. v. United States, 140 Fed. Cl. 117, 120 (2018); Contract Servs., Inc. v. United States, 104 Fed. Cl. 261, 269 (2012).

As noted above, protestor alleged that MCS is an interested party with standing to bring this protest because it is an actual bidder with a substantial chance of receiving the award but for USDA's evaluation errors," ISN claimed that "MCS is not in line for an award, so its protest should be dismissed," and defendant argued that "MCS lacks standing to challenge the award to ISN. The agency determined that MCS's price was too high to receive an award."

Under the heading: "**Relative Importance of Factors**" the Solicitation stated:

The award resulting from this solicitation will be made based on the best overall proposal that is determined to be the most beneficial to the Government (i.e., best value tradeoff process). The Technical Capability Factor is slightly more important than the Past Performance Factor. Technical Capability Subfactors, 1.1, 1.2, 1.3, 1.4 and 1.5, are rated in descending order of importance. Overall, Non-Price Factors, when combined, are significantly more important than Price. Price is not an adjectivally rated Factor; however, the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such

cases, where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal.

The Administrative Record makes clear that as evaluated ISN and MCS were the two strongest offerors for the Technical Factor and the Past Performance Factor. The Proposal Analysis Report listed the ratings for MCS' proposal as "Outstanding" for each Factor and each subfactor, and found the same for ISN's proposal. ISN and MCS were the only two offerors to receive "Outstanding" ratings. In discussing price competition, the Proposal Analysis Report determined:

> As discussed above four(4) of the eleven(11) offerors competing for the Property Preservation and Inspection contract were determined not to have submitted technical acceptable proposals: CWIS (Marginal); IEI, NHC, UFS (all "Unacceptable"). That left remaining seven(7) that were considered to have a technically "Acceptable" proposals that rated from Acceptable-Good-Outstanding. Of the seven(7), technical acceptable proposal, their pricing for Task Order 1, has a CPR of approximately $25M to $28M, on the CPR price spectrum.

> Therefore, based on the foregoing findings, and because multiple offers were received from several offerors that were considered responsible and were competing independently for the subject contract, the Technical Evaluation Team (TET) and the Source Selection Authority (SSA) determined that, in accordance with the provisions of FAR 15.403-1, Adequate Price Competition did exist for the procurement.

> In evaluating price, it was indicated in the solicitation, Attachment C-4, Instructions to Offerors, Evaluation and Basis for Award, par. 4, that "Price is not an adjectivally rated Factor; however, the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all nonprice factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal. Upon information above, and upon performing an integrated assessment of technical (including past performance) and price this competition came down to ISN and MCS, both providing technical exceptional proposals, and competitive pricing as being in line for award. However, in accordance with the solicitation and the CO's determination and recommendation in the Price Competition Memorandum, of the two exceptionally technically equal offerors, ISN, as the lowest price, provides the best overall value to the Government, with a technically superior proposal at a price that is comparatively competitive, fair and reasonable, balanced and realistic for the work.

> Therefore, there is no need for establishing a competitive range and going into discussions, because two highly rated exceptional proposals were received and there are no improvements required from either a technical or cost standpoint. There is no basis for a tradeoff between ISN and MCS due

to MCS did not supply any features which would warrant the premium in price offered over the lower price offered from ISN. Best value has been established with a superior technical proposal, with substantial past performance confidence rating, and reasonable, balanced and realistic pricing, all resulting in no risk to contract performance.

Regarding the MCS proposal, the Proposal Analysis Report stated, "even though MCS's pricing is found to be realistic and in conformity for their proposed technical approach, their pricing is unreasonably high based on the comparative analysis performed for this solicitation," and determined, "[t]herefore, MCS is not determined to be the best value in accordance with the evaluation criteria. MCS tied ISN in their technical rating with an 'outstanding' but had an overall higher price." Under the heading labeled, "**CONTRACTING OFFICER RECOMMENDATION**," the Price Competition Memo stated:

Best Value/Trade-Off. It is found that a trade-off analysis is not required based on my findings in the technical and pricing received from all offerors which had a lower technical rating and higher price than the recommended awardee. Technically, two offerors were rated "outstanding" and there were no discriminators in their technical ratings to lean towards performing a tradeoff.

The only discriminator, as indicated below is the divergent pricing, with MCS on the higher spectrum of the CPR, and ISN on the lower side. Note, the solicitation indicated that where all "non-price factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal." That is the case as noted below in this competition, where CLINs one and two were evaluated for the task order.

(capitalization and emphasis in original). The Source Selection Decision Document was consistent with the conclusions of the Proposal Analysis Report and Price Competition Memo:

The solicitation indicated that to be considered for award, Offerors must be rated overall as "Acceptable". Since [redacted] were rated below "Acceptable," and had pricing issues ranging from not fair, reasonable, realistic or balanced, incompliant with the solicitation, their proposals were found to be un-awardable for this solicitation requirement. Five of the Offerors ([redacted]) were rated "Acceptable" to "Good". Overall, my review concurs with the finding that their respective ratings ranging from "Acceptable" and "Good", does not demonstrate the highest understanding of the requirement, and therefore un-awardable for this solicitation requirement. Two of the Offerors, ISN and MCS, both rated "Outstanding" demonstrating that their technical proposals provided the highest understanding of the requirement. In addition, both Offerors were assessed Past Performance Confidence rating of "Substantial. However, the greatest discriminator between the Offeror's proposal was in their pricing. MCS

pricing was higher and outside of the competitive pricing of other acceptable offerors; whereas, ISN's pricing was the lowest, and comparable to the competitive pricing from other CPR range Offerors.

(capitalization in original).

The Source Selection Decision Document concluded:

MCS's Pricing for both the Task Order 1 and IDIQ are well over the respective CPR: Task Order 1 of $[redacted] ( CPR, $28,794,738.00); IDIQ ceiling $[redacted] (CPR $43,239,629.00) and even though deemed fair, reasonable, realistic and balanced in accordance with their technical approach, and historical pricing, their pricing is not competitive for this solicitation. MCS' price for Task Order 1, at $[redacted] is approximately $[redacted] over ISN price of $21,288,840.00; and for the overall IDIQ is approximately $[redacted[ higher. Therefore, I concur with the TET, and the Contracting Officer's evaluation that MCS's proposal is not determined to be the best value in accordance with the evaluation criteria discussed in the solicitation.

The solicitation, under Attachment C4, par. 4, entitled Competition Instructions, Evaluation and Basis for award, it [sic] is stated that:

"Overall, Non-Price Factors, when combined, are significantly more important than Price. Price is not an adjectivally rated Factor; however, the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all nonprice factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal".

Upon reviewing the information provided by the TET, as summarized above for the two technically highest rated Offerors, it is determined that Offeror, **Information Systems and Network Corporation** clearly provided the best value proposal, all factors considered. Their proposal was technically outstanding as well as appropriately priced and aligned with their technical approach to the solicitation requirement.

In my integrated assessment, I reviewed, in detail, both the merits and confidence ratings achieved by the highest rated offerors across the spectrum of evaluation factors and subfactors to select, with certainty, the most highly rated and qualified offeror, given the importance of the individual factors, for this solicitation requirement.

(capitalization and emphasis in original). The Proposal Analysis Report, Price Competition Memo, and the Source Selection Decision Document all agreed that only ISN and MCS offered "Outstanding" proposals, and were the only two considered for award, and the Source Selection Decision Document labeled every other proposal "un-

awardable for this solicitation requirement." All three agency evaluations emphasized that "Non-Price Factors, when combined, are significantly more important than Price," and that Price was "not an adjectivally rated Factor." The documents quoted above specifically note that ISN was awarded the contract over MCS only because of ISN's lower price. As the court has determined that the agency committed errors in the evaluation of ISN's proposal, it is not clear that ISN would have achieved the same Outstanding ratings as MCS, and, therefore, there is a "substantial chance" that MCS "would have received the contract award but for that error." <u>Eskridge & Assoc. v. United States</u>, 955 F.3d at 1345 (quoting <u>Statistica, Inc. v. Christopher</u>, 102 F.3d at 1582); <u>see also</u> <u>Glenn Def. Marine (ASIA), PTE Ltd. v. United States</u>, 720 F.3d at 912.

Defendant and intervenor referred to the documents that reference MCS' higher price. In the Proposal Analysis Report, MCS' pricing is described as "unreasonably high," and "unreasonably high based on the comparative analysis performed for this solicitation." The agency's Proposal Analysis Report, however, also stated "MCS's pricing is found to be realistic and in conformity for their proposed technical approach." Additionally, the agency in the Price Competition Memo indicated:

> Although MCStechincal [sic] rating is outstanding, pricing is at the higher end of the CPR, and is much higher than other similar ranked proposals which precludes them from being in line for an award. Note, in accordance with evaluation criteria set forth in Section M paragraph 4., "the Price Factor will become the more dominant factor as technical proposals reach technical equality. In such cases, where all non-priced factors being evaluated are virtually the same, best value may be represented by the lowest-priced proposal."

(capitalization in original). Despite this statement in the Price Competition Memo, the conclusion of the Price Competition Memo did not indicate that MCS was not eligible for award, nor did the Source Selection Decision Document, which determined that MCS' pricing was "deemed fair, reasonable, realistic and balanced in accordance with their technical approach, and historical pricing," but that MCS' "pricing is not competitive for this solicitation." As noted above, the Proposal Analysis Report, Price Competition Memo, and the Source Selection Decision Document were in agreement that the only two proposals considered for award were only ISN and MCS as ISN and MCS were the only proposals rated offered "Outstanding" for Technical and "Substantial Confidence" for Past Performance. The Price Competition Memo noted that price was the determining factor in recommending ISN for award and that:

> Technically, two offerors were rated "outstanding" and there were no discriminators in their technical ratings to lean towards performing a tradeoff.

> The only discriminator, as indicated below is the divergent pricing, with MCS on the higher spectrum of the CPR, and ISN on the lower side. Note, the solicitation indicated that where all "non-price factors being evaluated are virtually the same, best value may be represented by the lowest-priced

> proposal." That is the case as noted below in this competition, where CLINs one and two were evaluated for the task order.

(capitalization in original). The Proposal Analysis Report also determined, "[u]pon information above, and upon performing an integrated assessment of technical (including past performance) and price this competition came down to ISN and MCS, both providing technical exceptional proposals, and competitive pricing as being in line for award," despite previously indicating MCS' price proposals was "unreasonably high based on the comparative analysis performed for this solicitation." MCS higher price, although the basis for not receiving the award, based perhaps on the faulty evaluations, did not eliminate it from consideration. MCS has demonstrated standing, and has proven prejudice.

Injunctive Relief

After concluding the agency's evaluation of ISN was arbitrary and capricious, and that MCS was prejudiced by the agency's actions, the court considered whether MCS is entitled to the requested injunctive relief. In Centech Group, Inc. v. United States, the Federal Circuit set out the test for a permanent injunction, stating:

> To determine if a permanent injunction is warranted, the court must consider whether (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d at 1037 (citing PGBA, LLC v. United States, 1228–29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987))); see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1325 (Fed. Cir.) (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief), reh'g and reh'g en banc denied (Fed. Cir. 2004); MVM, Inc. v. United States, 149 Fed. Cl. 478, 492 (2020); Kiewit Infrastructure West Co. v. United States, 147 Fed. Cl. 700, 712 (2020); Remington Arms Co., LLC v. United States, 126 Fed. Cl. 218, 232 (2016). Success on the merits has been said to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." Dellew Corp. v. United States, 108 Fed. Cl. 357, 369 (2012) (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1312). While success on the merits is necessary, it is not sufficient for plaintiff to establish that it is entitled to injunctive relief. See Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 353 ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative because the three equitable factors must be considered, as well.") (citing PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)). The four factors are to be considered collectively, rather than individually, such that

> "[n]o one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." FMC Corp. [v. United States], 3 F.3d [424] at 427

[(Fed. Cir. 1993)]. Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. Id.

Sheridan Corp. v. United States, 94 Fed. Cl. 663, 668 (2010); see also Computer World Servs. Corp. v United States, 147 Fed. Cl. 584, 595 (2020); Wallace Asset Mgmt., LLC v. United States, 125 Fed. Cl. 718, 727 (2016); Amidon, Inc. v. United States, 124 Fed. Cl. 517, 522 (2015).

In the above captioned bid protest, as discussed above, MCS established success on the merits by demonstrating that the agency acted arbitrarily and capriciously regarding the agency's evaluation of ISN's proposal. Having concluded that protestor had succeeded on the merits of its bid protest, the court considered the additional factors to determine whether protestor was entitled to injunctive relief.

Regarding whether or not the protestor will suffer irreparable harm if injunctive relief is not granted, "[w]hen assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" Insight Sys. Corp. v. United States, 110 Fed. Cl. 564, 582 (2013) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)); see also Rush Constr., Inc. v. United States, 117 Fed. Cl. 85, 101 (2014); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494; Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000). "As to the second factor, irreparable harm exists when an offeror has lost the opportunity to compete fairly for a contract." Kiewit Infrastructure West Co. v. United States, 147 Fed. Cl. at 712 (citing HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 245 (2012)). "The Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 494 (citing CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 390–91 (2010); Serco, Inc. v. United States, 81 Fed. Cl. at 501–02; Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 826, 828 (2002)); see also Remington Arms Co., LLC v. United States, 126 Fed. Cl. at 232 (explaining that the loss of potential work and profits from a government contract constitutes irreparable harm); BINL, Inc. v. United States, 106 Fed. Cl. 26, 48 (2012) ("Irreparable harm is established by a lost opportunity to fairly compete."); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. at 245 (citing several cases); Magnum Opus Techs., Inc. v. United States, 94 Fed. Cl. 512, 544 (2010) ("'A lost opportunity to compete in a fair competitive bidding process for a contract is sufficient to demonstrate irreparable harm.'"), motion to amend denied, 94 Fed. Cl. 553 (2010) (internal citations omitted). The loss of a valuable business opportunity "deriving from a lost opportunity to compete in a fair competitive bidding process for a contract," can be sufficient to constitute irreparable harm. See Overstreet Elec. Co. v. United States, 47 Fed. Cl. at 744 (citing United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. 312, 323 (1998)); see also KWR Constr., Inc. v. United States, 124 Fed. Cl. at 363 (agreeing with protestor that the lost opportunity to compete for a future contract will cause irreparable harm); Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. at 828; United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm.").

According to a judge of this court, "[t]he court has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm." BINL, Inc. v. United States, 106 Fed. Cl. at 49 (quoting Furniture by Thurston v. United States, 103 Fed. Cl. 505, 520 (2012) (citing BayFirst Sols., LLC v. United States, 102 Fed. Cl. 677, 696 (2012))); see also MORI Assocs., Inc. v. United States, 102 Fed. Cl. 503, 552–53 (2011). Additionally, Judges of the United States Court of Federal Claims have determined that a protester suffers irreparable injury when it has been deprived the opportunity to compete fairly for a contract. See Wackenhut Servs., Inc. v. United States, 85 Fed. Cl. 273, 311 (2008) (citing Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004)); see also Info. Scis. Corp. v. United States, 73 Fed. Cl. at 127.

Defendant argued that "MCS's failure to establish likelihood of success on the merits and irreparable harm warrants denial of its request." Protestor argued that "MCS was not given the opportunity to compete fairly in the procurement process based on the USDA's unreasonable evaluation errors," and argued that immediate injunctive relief was "necessary to prevent the loss of anticipated profits from performance of the contract," and concluded, "[t]he loss of this opportunity is irreparable because MCS has no adequate remedy at law, which would merely provide for bid preparation costs." The court agrees with protestor that it would have faced irreparable harm if an injunction was not granted.

Regarding the third factor, the balancing of the hardships, protestor claimed that "[t]he USDA faces no apparent hardship, as there will be no delay in performance if the injunctive relief is granted, and any inconvenience caused to ISN by a delayed contract award and transition is minimal." Protestor also claimed "MCS will face significant hardship if the Agency goes forward with its award to ISN. MCS will face lost profits from performance while the legal action is ongoing and will have to re-transition into its role as the contractor if it is later granted the award based on a reasonable evaluation of the proposals." Defendant responded that the "agency suffers significant financial harm while MCS protests this award (for the second time on the merits)," and claimed, "the daily average cost difference to the agency while MCS, rather than ISN, performs is $26,310.14," and "[m]oreover, the agency will continue to suffer financial harm the longer that ISN's performance is delayed." Although there could be some hardship and cost for the government to revisit a procurement, including this one, that hardship is outweighed by the hardship to protestor when a flawed procurement evaluation is allowed to stand.

As to the public interest factor, "'[t]he public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion.'" CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495 (quoting PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003)); see also Cohen Fin. Servs., Inc. v. United States, 110 Fed. Cl. 267, 289 (2013); United Int'l Investigative Servs., Inc. v. United States, 41 Fed. Cl. at 323 ("[T]he public has a strong interest in preserving the integrity of the procurement process.") (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)); Am. Safety Council, Inc. v. United States, 122 Fed. Cl. 426, 444 (2015) (holding that "the public interest will be served by an injunction by preserving the integrity of the procurement process"); Applied Bus. Mgmt. Sol., Inc., LLC v. United States, 117 Fed. Cl. 589, 608 (2014); BINL, Inc. v. United States, 106 Fed. Cl. at 49 ("With regard to the public interest, it is well-settled that there is a public interest in remedying

violations of law."). An important public interest is served through conducting "honest, open, and fair competition" under the FAR, because such competition improves the overall value delivered to the government in the long term. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. at 495. "[T]he public interest is served by injunctive relief where the court has concluded that the government violated an applicable regulation and related provisions in the solicitation, and 'maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction.'" Q Integrated Cos. LLC v. United States, 126 Fed. Cl. 124, 147 (2016) (quoting Springfield Parcel C, LLC v. United States, 124 Fed. Cl. 163, 193 (2015)).

MCS argued that it is in the public interest to grant protestor's injunctive relief "[b]ecause the Agency's evaluations in the present procurement did not conform to the requirements of the FAR or Solicitation." As the court has found that the USDA's improper evaluation of ISN's proposal was arbitrary and capricious, the court finds that it was in the public interest to enjoin the agency from continuing with contract performance with ISN. On balance, the injunctive factors weighed in favor of protestor and in favor of granting an injunction of ISN's performance of the contract with the USDA.

## CONCLUSION

As described above, based on the urgency described by the defendant, and as indicated to the parties previously in an oral decision, the court found that the agency's actions were arbitrary and capricious and protestor's motion for injunctive relief was orally granted, effective immediately. Defendant's motion for judgment on the Administrative Record was denied.[15] The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[15] The parties, however, requested a written memorialization of the decision, which is reflected above.